GARY EDWARD DARBY *v.* STATE OF MARYLAND

[No. 1181, September Term, 1979.]

*Decided May 12, 1980.*

586

The cause was submitted on briefs to MORTON, MOORE and WILNER, JJ.

Submitted by *Alan H. Murrell, Public Defender,* and *Geraldine Kenney Sweeney, Assistant Public Defender,* for appellant.

Submitted by *Stephen H. Sachs, Attorney General, William H. Kenety, Assistant Attorney General, Arthur Marshall, State's Attorney for Prince George's County,* and *Michael Gallavan, Assistant State's Attorney for Prince George's County,* for appellee.

WILNER, J., delivered the opinion of the Court.

About 10:30 in the evening of June 27, 1978, as they were returning home, Mr. and Mrs. Warren Weaver were met at the entrance to their apartment building by two young men who, at gunpoint, relieved them, respectively, of their wallet and purse. Appellant and a co-defendant were ultimately arrested and charged with a number of offenses arising from the incident. The cases against the two suspects were severed, and after a jury trial in the Circuit Court for Prince George's County, appellant was convicted of two counts of armed robbery and sentenced to prison for ten years.

In this appeal, appellant asks the following questions:

"1. Did the judge err in denying Appellant's motion to dismiss for lack of speedy trial?

"2. Did the trial judge err in denying Appellant's motion to suppress his confession?

"3. Did the trial judge err in overruling defense objection to the jury instructions concerning the confession?"

(1) *Speedy Trial*

The chronology of relevant events is as follows:

(1) July 20, 1978: appellant arrested. This starts the clock running.

(2) August 29, 1978: defense counsel enters his appearance.

(3) September 1, 1978: appellant petitions for "reverse waiver" to Juvenile Court (*see* Md. Ann. Code art. 27, § 594A).

(4) September 26, 1978: trial set for November 9, 1978.

(5) October 5, 1978: waiver investigation ordered, report to be submitted by November 23, 1978; trial date of November 9, 1978, obviously not possible.

(6) November 28, 1978: waiver petition heard and denied; trial scheduled for December 11, 1978.

(7) December 11, 1978: prosecutor assigned to the case is ill; trial rescheduled for February 28, 1979.

(8) February 28, 1979: no courtroom available, trial rescheduled for April 10, 1979.

(9) March 1, 1979: motion to dismiss for lack of speedy trial filed by appellant.

(10) April 10-12, 1979: motion to dismiss for lack of speedy trial denied; trial conducted; ends in hung jury, mistrial declared.

(11) August 13-14, 1979: retrial, ends in convictions.

Appellant's motion to dismiss dealt only with the delay between arrest and the first trial. He did not complain in the trial court and has not complained here about the additional interval between the two trials. Accordingly, we shall consider the speedy trial issue raised by him only as it relates to the eight-month, twenty-day period from July 20, 1978 to April 10, 1979.

Appellant attacks the court's ruling on two grounds. He asserts, we think correctly, that the nearly nine-month interval suffices to trigger the balancing test or procedure mandated by *Barker v. Wingo,* 407 U.S. 514 (1972). *See Epps*

*v. State,* 276 Md. 96 (1975). From this, he argues (1) that the trial court failed to consider the four balancing factors, but decided the motion solely upon a finding that appellant had not suffered actual prejudice, and (2) that if the balancing test were considered, it would necessitate a finding that his right to a speedy trial had indeed been violated. His complaint, then, is that the court erred both in its ultimate finding and in the process used to develop or support it. We disagree on both points.

With respect to the process, at the hearing conducted on the speedy trial motion, appellant's chief complaint was that, by reason of the delay since February 28, 1979 (when trial was postponed because of the lack of a courtroom) an important defense witness — the co-defendant, Robert Johnson — had become unavailable. Most of the testimony and argument at that hearing concerned the importance of Mr. Johnson's testimony, the efforts of the defense to secure Johnson's appearance, the fact that he had been available on February 28, and his current unavailability due to residence in the District of Columbia. After a recess, the court was able to locate Mr. Johnson and secure his appearance as a defense witness.[1] That element of prejudice was therefore satisfactorily resolved.

During the course of the hearing, there was some discussion about the earlier postponements and the reasons for them, and the court was aware that appellant had been incarcerated since his arrest. Counsel's argument, however, throughout the proceeding, centered on the particular prejudice resulting from Johnson's presumed unavailability. When Johnson appeared, the court denied the motion with this explanation:

"Motion to Dismiss for Lack of Speedy Trial is

---

1. Counsel conceded that he had made no effort to obtain Johnson's compulsory appearance, desiring instead that he be a voluntary witness. Johnson was also under indictment but had apparently been released on bond. The bail bondsman produced Johnson in court, and, after advice from counsel, Johnson agreed to waive his right against self-incrimination and testify for appellant. The record before us does not indicate whether Johnson actually testified at the first trial. He was not called as a witness at the second trial.

denied. The prejudice that the defendant was complaining of was the inability to have a particular witness here to testify in his behalf. That witness is now here. That is the only grounds I heard. I mean, at this time, the only allegation I heard, *as far as prejudice to this defendant because of delay. That prejudice* has now been eliminated. The motion is denied." (Emphasis supplied.)

Counsel did not then question the court's ruling or suggest the failure to consider the other elements of the balancing test.

We concur with appellant that where, as here, the delay is sufficient to trigger the Constitutional balancing test, *all elements of it* must be weighed and considered by the court. But that does not mean that the court must necessarily articulate its findings as to elements about which there appears to be no dispute. There was simply no argument here as to the length of the delay or when appellant asserted his right; and, to the extent there was any disagreement about the reasons for the delay, the court made its position clear when that subject was being discussed. In announcing its ruling, the court confined its remarks to the only element that was really contested, but we shall not presume from that a failure to consider all of the required elements.

Neither do we agree that the court erred in its ultimate conclusion. A delay of less than nine months, though sufficient to trigger the balancing test, is not a grossly inordinate one. Both by Rule and statute, a six-month period is generally regarded in this State as reasonable for ordinary trial preparation, especially so when complicated by the filing of a waiver petition necessitating a social service investigation.

The case would have been tried within the six-month period — indeed within five months — but for the illness of the prosecutor. The four-month delay occasioned by that and the unavailability of a courtroom on February 28, 1979, though chargeable to the State under the *Barker-Epps* formula, is not accorded the same weight or significance as

a deliberate delay. There was, of course, no evidence of deliberateness here; for the most part, the State made reasonable efforts to proceed expeditiously after the first postponement.

In articulating the assignment of responsibility under *Barker,* we would characterize the five-month period from arrest to December 11, 1978, as essentially neutral, and the four-month period from then until trial as chargeable to the State but not heavily so. Appellant did not assert his right to a speedy trial until March 1, 1979 (and then only by motion to dismiss, not a demand for immediate trial), and trial was in fact held forty days later.

Our one possible disagreement with the trial court concerns the element of prejudice. Quite apart from the presumptive prejudice attendant to any delay of Constitutional dimension, appellant suffered actual prejudice from his incarceration for the nearly nine-month period. This was not mentioned by the court which, as noted, commented only upon the prejudice alleged by Johnson's presumed unavailability. That does not mean, of course, that the court ignored the substantial prejudice emanating from appellant's incarceration. On balance, given the length of delay, the reasons for it, the delay in asserting the right, *and* the prejudice, we do not believe there has been a Constitutional violation. The motion to dismiss was therefore properly overruled.

### (2) *Suppression of the Confession*

Appellant moved, pretrial, to suppress any confession made by him on the ground that it was involuntary. The docket entries reveal that this motion was heard by the court during the course of appellant's first trial — on April 11, 1979 — and was denied. The transcript of the first trial is not included in the record now before us, and we therefore do not know what evidence was offered in support of or in opposition to the confession at that time. We know only that the motion was denied, and infer from that that the confession was admitted into evidence.

The first trial, as noted, ended in a mistrial, and the suppression motion — still alive — was set for hearing on the first morning of the second trial. The issue was not addressed preliminarily, however, but arose during the testimony of Officer Larry Begett. Officer Begett, and his colleague Officer Robert Edgar, had initially responded to the call for assistance by the Weavers, had observed and stopped appellant and his co-defendant some 10 minutes later in the general vicinity of the robbery, and had released the pair (notwithstanding Mrs. Weaver's positive identification of them) because of their uncertainty as to the reliability of the identification.

Begett's next contact with appellant came on July 20, 1978 — some four weeks later — when he accompanied District of Columbia police officers to appellant's home in the District in order to effect his arrest in connection with the Weaver robberies. Begett saw appellant again the following night — July 21 — at the Hyattsville Police Station. He said that he had advised appellant of his various *"Miranda"* rights and had obtained a written waiver of them. When the State offered the waiver form into evidence, an objection was made as to voluntariness. The jury was then excused and testimony on the admissibility of the waiver form and the confession was taken before the court. *See Gill v. State,* 265 Md. 350 (1972); *Dempsey v. State,* 277 Md. 134 (1976).

In this sub-proceeding, Begett stated that he read the form to appellant, recorded his answers, and had appellant initial those answers. He said that the answers recorded by him accurately reflected what appellant stated and that appellant signed the form at the bottom.[2] Begett then began to take a written confession from appellant. Appellant answered all his questions and expressed no desire to stop the interrogation.

---

2. The waiver form dealt primarily with presentment before a judicial officer pursuant to Maryland District Rule 723, but also included the various *"Miranda"* rights. The last question on it asked, "Have any promises, threats, or inducements been made to pressure or coerce you into making this statement?" Begett wrote in the word "NO" in answer to that question and appellant initialled that answer and signed the form. Begett conceded that appellant was able to read and write, and could therefore have answered the questions himself, but insisted that he wanted Begett to record the answers.

On cross-examination, Begett acknowledged that (1) appellant had steadfastly maintained his innocence up to that point, (2) although appellant had been arrested some 15 hours earlier, at 8:25 a.m. on the 20th, Begett had him brought to the station from the lockup at midnight on the 20th-21st for interrogation, (3) he had "no specific reason" for not waiting until the next day to conduct the questioning, (4) after arriving at the station, appellant — 17 years old — was left handcuffed to a chair for nearly two hours while Begett was "doing paperwork and reviewing the case," and (5) when Begett started reading him the rights at about 1:50 a.m., appellant said he was "glad it was over with" and started confessing.

Appellant then testified that he signed the confession because he was afraid of the police, making a passing reference to the tragic occurrence, widely reported in the county, in which another young black suspect had shot two officers during an interrogation surrounded by allegations of brutality. Appellant said, specifically, that Officer Edgar told him (1) that he "wasn't going to leave the station" until he signed "those papers," and (2) "if I didn't sign it, he was going to smack my face up to the wall." He and Edgar, a white officer, were alone at this point. When appellant began to cry, Edgar left the room and Begett, a black officer, returned. Appellant still refused to sign. Then, Edgar "came back and I signed." [3]

The State neither cross-examined appellant nor produced any rebuttal evidence. At that point, therefore, appellant's specific charge that Edgar had threatened him with physical harm and continued detention at the police station remained unrebutted, indeed uncontradicted. Nonetheless, the court, "under all surrounding circumstances," declared the confession to be "freely and voluntarily made," and therefore overruled the objection to its admission.

The jury was then recalled and Begett essentially repeated his previous testimony. Although he said that appellant never asked to stop the interrogation and that the

---

3. Edgar's name appears as a witness to the confession.

answers he recorded were those given by appellant, Begett did not, in his direct examination, rebut the charges made by appellant against Edgar. On cross-examination, however, defense counsel managed to provide the State some of its missing evidence with these two questions:

> "Q  And if Darby [appellant] were to testify that he was threatened by Officer Edgar, would he be lying?
>
> "A  Yes, he would." (Tr. 65)
>
> * * *
>
> "Q  And so when you picked him up at midnight and began interrogating him at 1:50 he was just voluntarily giving you this information?
>
> "A  That is correct." (Tr. 67)

Appellant repeated his version, in somewhat more detail, to the jury. He again made clear that the alleged threats came only from Edgar, not from Begett, and that Begett was not in the room at the time. This time, however, the State produced both Begett and Edgar in rebuttal, and both denied that any threats were made.[4]

The procedure for resolving a challenge to a confession based upon voluntariness was succinctly set forth in *Gill v. State, supra,* 265 Md. 350, 357-58:

> "The question of the voluntary nature of a confession is initially decided by the trial judge and involves a mixed question of law and fact. If the judge receives it in evidence, its admission then becomes prima facie proof that the statement was

---

4. Edgar's response was a curious one:

> "Q  That evening, at any time that evening, before, after, or while State's Exhibit Nos. 1 and 2, the waiver of rights and the confession, were being done, any time before, during, or after that process, did you ever take your glasses off and yell at the defendant?
>
> "A  No, sir, *not at that time.*
>
> "Q  Did you ever threaten the defendant in any way?
>
> "A  *Not at that time, no."* (Emphasis supplied.)

No one asked him whether he had threatened appellant at any other time.

freely and voluntarily given. Once received, the evidence pertaining to the admissibility of the confession, which was first heard by the judge, is then submitted to the jury for its ultimate consideration. . . . Despite the fact that the accused's statement is received in evidence, if, from all the testimony in the case, the jury is not satisfied beyond a reasonable doubt that it was the free and voluntary expression of the suspect, then they must disregard it in determining his guilt or innocence."

It is clear from this, and from a subsequent discussion of the procedure in *Dempsey v. State, supra,* 277 Md. 134, 143 *et seq.,* that although the issue of voluntariness is submitted to both judge and jury, it is submitted to each for a different purpose. The judge determines voluntariness only for the purpose of deciding whether the confession is admissible as evidence — whether the jury can hear and consider it. The jury's role is to determine what, if any, weight to give the confession. If, contrary to the judge, the jury concludes that the confession is involuntary, it nevertheless remains as evidence in the case — it is not withdrawn as an exhibit, the testimony regarding it is not expunged; the jury simply gives it no weight. *In that sense,* a confession is not unlike other evidence: the court determines whether it is admissible, the jury determines what weight to give it. The only real difference is the *requirement* that the jury disregard the confession if it finds the same to have been involuntarily given.

This distinction in function between judge and jury is particularly significant in this case.

In *Streams v. State,* 238 Md. 278 (1965), and again in *Gill v. State, supra,* 265 Md. 350, the Court of Appeals made clear that "when it is contended that someone employed coercive tactics to obtain inculpatory statements, *the charge must be rebutted."* (Emphasis supplied.) *Gill,* at 353. Otherwise, the State has failed to meet its burden of proving that the confession is voluntary.

The problem in this case is that, in the sub-proceeding before the court to determine *admissibility* of the confession,

there was a total failure to rebut appellant's testimony about Edgar's threats, and thus the confession, under *Streams* and *Gill,* should never have been admitted into evidence. Before the jury, however, there *was* testimony to contradict appellant's charge which, if credited, would permit the jury to have found that the confession was voluntary.

Because of the different roles played by the court and jury, we cannot overlook the error made in admitting the confession or deem it somehow cured or rendered harmless by the subsequent evidence presented to the jury. The jury should never have been allowed to hear or consider this confession because, in the critical proceeding to determine its admissibility, the State failed to prove that it was voluntary. We must take cognizance of that error as we would any other error in the admission of prejudicial evidence or as we would if the suppression motion had been considered and improperly overruled pretrial. Upon the authority of *Streams* and *Gill,* therefore, we conclude that the court erred in denying appellant's motion to suppress and thus in admitting the confession. *See also Jarrell v. State,* 36 Md. App. 371 (1977); *Hutchinson v. State,* 38 Md. App. 160 (1977).

As reversal of appellant's conviction is mandated by this determination, we shall decline to address further the alleged error in the court's instructions. Upon retrial, the court will no doubt consider what the Court of Appeals said in *Gill* and *Dempsey, supra.*

> *Judgments reversed; case remanded for a new trial; costs shall not be reallocated, pursuant to Maryland Rule 1082 f.*