882 A.2d 330

James Ramiah LOGAN

v.

STATE of Maryland.

**No. 2361, Sept. Term, 2003.**

Court of Special Appeals of Maryland.

Sept. 7, 2005.

2

4

6

Fred Warren Bennett (Rachel M. Kamins on the brief), Greenbelt, for Appellant.

Edward J. Kelley (J. Joseph Curran, Jr., Attorney General on the brief), Baltimore, for Appellee.

Panel: HOLLANDER, JAMES R. EYLER, LAWRENCE F. RODOWSKY (Retired, specially assigned), JJ.

HOLLANDER, Judge.

This appeal arises from the tragic shooting deaths of Prince George's County Deputy Sheriffs James Arnaud and Elizabeth Magruder, who were gunned down on August 29, 2002, while attempting to serve an Emergency Psychiatric Commitment Order (the "Emergency Order") on James Ramiah Logan, appellant. Logan, who was then twenty-four years of age, was subsequently charged with two counts of first-degree premeditated murder and two counts of use of a handgun during the commission of a crime of violence.

Appellant filed a notice of his intent to raise the defense of not criminally responsible ("NCR"), pursuant to Md.Code (2001), § 3–109 of the Criminal Procedure Article ("C.P."). He later moved to suppress his post-arrest statements. At the conclusion of the hearing in October 2003, the court denied Logan's motion.[1] A jury in the Circuit Court for Prince George's County subsequently found appellant criminally responsible and convicted him of two counts of second degree murder and two counts of the handgun offense. The court sentenced appellant to a total term of imprisonment of 100 years.

Logan presents seven questions for our review, which we quote: [2]

*QUESTIONS PERTAINING TO PRETRIAL MOTIONS*

I. Did the trial court err in denying [appellant's] motion to suppress his statement where the police violated his *Miranda*[3] rights by telling [appellant] that he did not need a

---

1. On June 16, 2003, the State filed a notice of its intent to seek the death penalty. At the hearing, the court also heard argument as to numerous motions relating to the capital sentencing phase, which are not at issue here.

2. This Court granted appellant's request to file a brief beyond the 35–page limit provided in Md. Rule 8–503(d). We subsequently granted the State's request for the same privilege.

3. *See Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

lawyer during questioning because the truth could not jeopardize him?

*QUESTIONS PERTAINING TO VOIR DIRE*

I. Did the trial court err in failing to inquire of the venire whether any of them would have difficulty following the court's instructions on the defense of not criminally responsible?

II. Was the trial court's questioning on pretrial publicity inadequate?

*QUESTIONS PERTAINING TO TRIAL AND JURY INSTRUCTIONS*

I. Did the trial court violate [appellant's] right of confrontation when the court permitted the State to question one of [appellant's] experts about the fact that a Prince George's County Detention Center psychiatrist had failed to find that [appellant] suffered from paranoid schizophrenia?

II. Did the trial court err in failing to permit [appellant's] several expert witnesses from explaining to the jury that "appreciating" the criminality of one's conduct is different from "knowing" that one's conduct is criminal and in failing to instruct the jury on this distinction?

III. Did the trial court err in failing [to] instruct the jury on the defense of "settled insanity?"

IV. Did the trial court err in failing to adequately instruct the jury on the distinction between intent and criminal responsibility?

For the reasons that follow, we conclude that the advice of rights was defective, but any error in failing to suppress appellant's statements was harmless beyond a reasonable doubt. However, we agree with appellant that the court erred or abused its discretion in regard to the questions posed on voir dire concerning his NCR defense and pretrial publicity. Because we shall vacate appellant's convictions and remand for a new trial, we decline to reach appellant's remaining contentions.

## I. FACTUAL SUMMARY

### A. Trial[4]

On August 29, 2002, Valencia Logan, appellant's wife, filed an ex parte Petition for Emergency Evaluation (the "Petition"), seeking hospitalization of appellant, claiming he suffered from paranoid schizophrenia. In the Petition, which was admitted at trial, Ms. Logan alleged that appellant's "condition is worsening each day." She asserted in the Petition that appellant "sees, hears messages from ([G]od)—someone. Keeps refering [sic] to the bible, and is saying we are in Revelations." Further, she averred that there was a "clear and imminent danger" of appellant "doing harm to self or others," because he "thinks that death is imminent." That same day, the District Court for Prince George's County issued an Emergency Order, directing that appellant "be taken into custody by any peace officer and transported to Prince George's Hospital Center for examination and emergency care and treatment if necessary."

Appellant's father, James Logan, Sr., recalled that on the night of August 29, 2002, Deputies Arnaud and Magruder arrived at his home with the Emergency Order. He directed them to the basement, where appellant and his friend were "having a bible study." "After a period of time," Mr. Logan heard the male sheriff tell appellant, " 'You've got to come and go with me now.' " He also heard appellant reply, " 'I told you I'm not going with you anywhere.' " According to Mr. Logan, appellant came up from the basement, went into the guest bedroom, and closed the door. Arnaud and Magruder followed appellant. While Mr. Logan was in the master bedroom with his wife, he "heard something that sounded like loud pops, a few pops or something." He and his wife mistakenly thought that the deputies had shot appellant. Mr.

---

4. Numerous witnesses testified over the course of the two-week trial that began on October 23, 2003. Our summary will focus on the evidence central to the issues on appeal.

Logan saw appellant exiting the home with what "appeared to be a weapon" in his hands.

Dr. Jack Matthew Titus, M.D., the Deputy Chief Medical Examiner, testified that Magruder died as the result of a single gunshot wound to the head. Titus further opined that Arnaud died from "[m]ultiple gunshot wounds," one of which "hit the carotid artery . . .," which "is the one that goes up to the brain and gives the brain most of its blood supply." Another gunshot wound "injured the liver," and was "associated with internal bleeding. . . ." Other wounds caused Arnaud to "hemorrhage."

Appellant was apprehended in the early morning hours of August 31, 2002, several miles from his home, in a shed adjacent to an apartment building. After being treated at Prince George's Hospital Center (the "Hospital") for injuries inflicted by the police dog deployed during the apprehension, appellant was taken to the Criminal Investigation Division ("CID") of the Prince George's County Police Department for questioning. After signing an Advice of Rights and Waiver form, appellant confessed to the shootings. Although appellant admitted that he intended to kill the sheriffs, he insisted that he was "commanded" to do so by God.

In support of his NCR defense, appellant presented the testimony of three expert witnesses: Neil Blumberg, M.D., a general and forensic psychiatrist; Joanna Brandt, M.D., a general and forensic psychiatrist; and Lawrence Donner, Ph. D., a clinical psychologist. The defense experts testified that, at the time of the shootings, appellant suffered from paranoid schizophrenia, which prevented him from appreciating the criminality of his conduct or conforming his conduct to the requirements of the law.

In rebuttal, the State produced the expert testimony of Scott Uithol, M.D., a general psychiatrist; Marc Tabackman, Ph.D., a psychologist; Christiane Tellefsen, M.D., a forensic psychiatrist; and Robert Phillips, M.D., a general and forensic psychologist. In general, the State's experts opined that appellant was suffering from a substance induced psychosis at

the time of the shootings and was criminally responsible for his actions.

We shall include additional facts in our discussion of the issues.

## B. Suppression Motion

Prior to trial, appellant moved to suppress the statements he made during his interrogation. Logan claimed, *inter alia,* that he "was not properly advised of his *Miranda* rights, nor did he waive these rights." [5] In a supplemental memorandum, appellant focused on statements made by Detective Ismael Canales of the Prince George's County Police Department. He alleged that the *Miranda* warnings were defective because Canales "made false and misleading statements" before and during the advisement, and these deceptive and "contradictory" statements "eviscerate[d]" the *Miranda* warnings.

In its opposition, the State argued that the colloquy between Detective Canales and appellant was merely "an exhortation to tell the truth and in light of the follow up conversations and advices, can in no way be said to be a promise of any sort that [appellant] relied upon." It maintains that, under Maryland law, "exhortations to tell the truth are permissible approaches for police to encourage a suspect to give a statement." Moreover, the State asserts that "[a]ny doubt as to whether Canales had promised Logan anything was soon dispelled a few moments later," when appellant stated that he had neither been promised anything nor threatened by Detective Canales.

What follows is a summary of the evidence adduced at the suppression hearing with respect to the *Miranda* issue.[6]

---

5. Appellant also asserted that he "was suffering from a mental illness at the time he was interrogated," and "was in no mental or physical condition to make a voluntary statement." Further, he claimed that his right to counsel under the Fifth and Sixth Amendment was violated during interrogation, rendering his statements inadmissible. On appeal, however, Logan pursues only the alleged *Miranda* violation.

6. Appellant's Brief includes a "Statement of the Facts" pertinent to trial, but does not include a summary of the facts adduced at the

Prince George's County Police Corporal Thomas Brown, Jr. was assigned to the "Special Operations Division K9 Unit" on the date in question. He stated that, "sometime after 1:30 a.m." on August 31, 2002, he "responded to assist" in the apprehension of appellant. Brown recalled:

> We ended up tracking to a shed and a dumpster area. At that point the dog indicated the presence of a person inside the building. At that point we set up a perimeter. Several warnings were issued [to appellant] with no results. We used a pepper ball gun to deploy into the building. Several rounds were fired. Once again it [sic] was no response. We breached the doorway and sent the K9 to make apprehension.

According to Corporal Brown, appellant was in the corner of the shed and the dog was "engaged on" appellant. Brown told appellant "to stop resisting and fighting the dog, which he failed to do . . . ." At that time, "Sergeant Lipsey came in and used a Taser gun" on appellant. Appellant was then arrested. Prince George's County Police Corporal Michael Seyfried helped transport appellant to the Hospital.

Homicide detective Ismael Canales, an eleven-year veteran of the Prince George's County Police Department, "immediately responded" to the Hospital after he was "notified" that appellant was headed there. He met appellant in "the emergency room entryway" at "about 2:25 in the morning," and accompanied him during treatment. Canales recalled that appellant sustained "several scrapes about his body," as well as "a puncture wound to one ankle and another puncture wound to an arm." After appellant received "a couple of sutures . . . and . . . some antibacterial kind of ointment," he was "released into [police] custody." Canales informed appellant that he intended to "talk to him" at the police station.

---

suppression hearing. Our review of the trial court's ruling with respect to a suppression motion is based solely on the record of the suppression hearing. *Dashiell v. State*, 374 Md. 85, 93, 821 A.2d 372 (2003); *Cooper v. State*, 163 Md.App. 70, 84, 877 A.2d 1095 (2005).

When appellant arrived at police headquarters, he was "taken straight from the [police] vehicle into the interview room[.]" According to Canales, the audio and video cameras were activated and recorded "what occurred after that[.]" [7] He explained that appellant's "mental health issues" were "one of several issues" he kept in mind in deciding to record the interview. Canales recalled:

[Appellant is] actually placed in the interview room [at] about 3:53 in the morning of the 31st [of August], 2002. I'm then in the room several times. I'm in and out of the room several times. One at 4:05 [a.m.] at which point I'm initially asking if he wants food, drink. Just kind of explaining to him what's going to happen. I then exit the room and [when] I return I provide him with some water, which he had requested.

I leave out [of] the room sometime after 6:00 [a.m.] later on after we have the discussion. I'm in several more times in and out the rest of the time he's there until about 7:30, quarter to 8 in the morning.

The interview began at approximately 4:05 a.m. [8] During the interview, appellant was not handcuffed. Moreover, Canales offered food and drink to appellant "throughout the several times I'm talking to him." Appellant was also "given the opportunity to go to the bathroom."

Before advising appellant of his *Miranda* rights, Canales obtained general background information from appellant. As

---

7. A videotape and a DVD recording of the interview were admitted into evidence, without objection. The portions that were played at the suppression hearing were transcribed in the record. The transcript itself was not introduced until the trial, however. By Order dated January 25, 2005, we directed the circuit court to transmit these exhibits to this Court.

 At the suppression hearing, the court agreed that the DVD "is the best evidence," and noted that it had "listened to it a couple of times." Nevertheless, because the transcript contains, in written form, the content of the recordings, we have relied on the transcript.

8. We have no document indicating the precise time that the interview began. We rely on Canales's testimony that, at 4:05 a.m., he began to explain "what's going to happen."

we shall see, he also gave certain assurances to appellant. Canales then obtained a waiver of rights. We quote at length from the entire interview because the sequence of events and the precise words are crucial to our analysis.

DETECTIVE CANALES: Okay. You single? Married? Divorced?

[APPELLANT]: Married.

DETECTIVE CANALES: What's your wife's name?

[APPELLANT]: Valencia. . . .

DETECTIVE CANALES: Same last name, Logan?

[APPELLANT]: Yes.

DETECTIVE CANALES: Okay. How old is she?

[APPELLANT]: She is 22.

DETECTIVE CANALES: And are you two living in Lynmont?

[APPELLANT]: Yes.

DETECTIVE CANALES: In the same address?

[APPELLANT]: Yes. She goes over her mother's house a lot of times.

DETECTIVE CANALES: What's her mother's address?

[APPELLANT]: I've got the address, hold on. 7012 Woodthrush Drive.

I mean, can I ask what the information will be used for?

DETECTIVE CANALES: Actually what it is [is] just your background information, that's all. It basically lets me know who you are and basically let [sic] me know some background on you so when you and I start talking, it's not like I'm talking to a stranger; all right?

[APPELLANT]: Okay.

DETECTIVE CANALES: Okay. Where's Woodthrush Avenue?

[APPELLANT]: That's in Lanham, Maryland.

\* \* \*

DETECTIVE CANALES: And this is whose house?

[APPELLANT]: That's her mother's house.

DETECTIVE CANALES: Mother's house. Okay. *And mind you this is between you and I now. We are talking; okay?*

[APPELLANT]: Okay.

DETECTIVE CANALES: What's her mother's name?

[APPELLANT]: Ethelen. I don't know—I know it. Ethelen Flood.

DETECTIVE CANALES: Flood. Nobody—*like I said, take your time, we're just talking; all right. Like I said, nobody's here to hurt you or anything. We are just talking.*

You have any children?

[APPELLANT]: Yes.

DETECTIVE CANALES: How many?

[APPELLANT]: Two.

DETECTIVE CANALES: Boys, girls?

[APPELLANT]: Boys. *I mean I can tell because then after this happened and everything, all the information they wants* [sic] *to harm me or something.*

DETECTIVE CANALES: *Who wants to harm you?*

[APPELLANT]: I don't know. Like I say, somebody wants to do something to my folks.

DETECTIVE CANALES: *Let me make sure we understand each other; okay. I'm going to look out for your folks; okay. They're fine. I've spoken to them on the phone. They are okay; okay? So you don't have to worry about anything there; all right?*

[APPELLANT]: All right.

DETECTIVE CANALES: As far as your family, believe me I'm a family man as well so I understand where you are coming from. *I won't use any of the information to harm you. No one out here is going to harm you or your family. You and I are talking. Believe me I will not allow anything to happen to you; okay?*

[APPELLANT]: Yes.

DETECTIVE CANALES: *Just talk to me, let me know how you feel. We will talk about it; okay?*

[APPELLANT]: Okay.

\* \* \*

DETECTIVE CANALES: Okay. Do you use drugs?

[APPELLANT]: Well, it depends.

DETECTIVE CANALES: *Like I said, we are just talking; okay. No problem if you do. I'm not charging you with anything in reference to you using drugs or anything.*

[APPELLANT]: I mean I had, you know.

DETECTIVE CANALES: In the past?

[APPELLANT]: Yes.

DETECTIVE CANALES: What drugs did you use?

[APPELLANT]: Different drugs.

DETECTIVE CANALES: I'm sorry?

[APPELLANT]: I've used, I don't know, maybe marijuana. Maybe coke.

DETECTIVE CANALES: Uh-huh.

[APPELLANT]: And what they call it. The dip or whatever.

DETECTIVE CANALES: Uh-huh. Anything else?

[APPELLANT]: And what happened to me the last time.

DETECTIVE CANALES: *What happened to you the last time?*

[APPELLANT]: *They ask me all this information, then went to take me somewhere.*

DETECTIVE CANALES: *We're here; okay. I told you this back when we were in the hospital; okay. We need to talk. There is some things we basically need to make clear. It's your opportunity to tell your side [of] what's going on here; okay. All I'm doing right now initially is kind of going through some background stuff. I'm doing this, you know, the times that is all spent is not meant to hurt you at all. I'm not trying to do anything to go ahead and harm*

*you in any way, but what I would need to do is to get to the truth as far as what's going on; okay?*

[APPELLANT]: *The truth.*

DETECTIVE CANALES: *I'm not—believe me, I understand what your concerns are. I'm not here to do anything to you; okay? We're just here talking trying to kind of get to the bottom of what's going on; okay?*

[APPELLANT]: Okay.

(Emphasis added).

At approximately 4:50 a.m., Canales proceeded to discuss appellant's *Miranda* rights in the following exchange:

DETECTIVE CANALES: I need to make sure you're aware [of] what your rights are now; okay. You and I need to talk about what's going on here in reference to the incident that happened; okay?

[APPELLANT]: Okay.

DETECTIVE CANALES: *I'm not here to hurt you. I need to get to the truth of what's going on,* but *I need to understand that you understand what your rights are;* okay?

[APPELLANT]: Okay.

DETECTIVE CANALES: I'm asking you so I'm sure that you have seen some TV shows and everything else. You know what some of your rights are?

[APPELLANT]: Yes.

DETECTIVE CANALES: What are some of your rights?

[APPELLANT]: *I have the right to be read all my Miranda [rights] and at any time that I'm asked—*

DETECTIVE CANALES: Uh-huh.

\* \* \*

[APPELLANT]: *I got a right to Miranda. I got a right to remain silent.*

DETECTIVE CANALES: Uh-huh.

[APPELLANT]: *I got a right to be informed for any type of what was the probable cause, you know—*

DETECTIVE CANALES: That's correct. What I'm going to do, *I'm going to read you your rights to you, okay?*

[APPELLANT]: Okay.

DETECTIVE CANALES: Once we go through if you have any questions while I'm reading to you or anything I need you to express those concerns to me; okay? *What I want you to understand is if you have any problem at all in speaking with me about this incident we need to talk about it.*

[APPELLANT]: *Long as it's truthful.*

DETECTIVE CANALES: *I will be one hundred percent truthful with you; okay. I need you to be the same way.*

(Emphasis added).

Appellant then inquired, "Am I being [put] under arrest?" Canales responded:

So I'm letting you know you are currently under arrest; okay? I don't want you to think that, you know, this is some trick or anything. What it is right now is we're trying to get to the bottom of what happened. Make sure the charges fit the crime. If you have something to do with this then we'll talk about it, see what it is that's going on. Make sure what you are charged with matches what you did; okay. So that's all I'm trying to do right now. Verify the information that you have right now is correct; okay?

Detective Canales then advised appellant, as follows:

DETECTIVE CANALES: You have the right to remain silent. If you choose to give up this right, anything you say can be used against you in court. You understand that?

[APPELLANT]: Yes.

DETECTIVE CANALES: You got the right to talk to a lawyer before you are asked any questions and to have a lawyer with you, you understand that?

[APPELLANT]: (Indicating)

DETECTIVE CANALES: If you want a lawyer but cannot afford a lawyer, they'll be provided to you at no cost. And basically if you want to answer questions now without a lawyer, you still have the right to stop answering at any time, you understand that?

[APPELLANT]: Yes.

DETECTIVE CANALES: At any time when we are talking, you just feel like you want to stop, you let me know, we'll stop; okay?

[APPELLANT]: Yes.

DETECTIVE CANALES: So that means at any time when we're talking, if you just feel like you want to stop, just let me know and we'll stop. Okay?

[APPELLANT]: *I've always felt kind of comfortable better with a lawyer, you know what I mean?*

DETECTIVE CANALES: Uh-huh.

[APPELLANT]: *But, you say—*

DETECTIVE CANALES: *We're talking.*

[APPELLANT]: *We're talking about everything. We're talking.*

DETECTIVE CANALES: *I'm going to be straight forward with you about everything. The only thing I will ask you to do the same with me.*

[APPELLANT]: All right. *I don't want to jeopardize anything.*

DETECTIVE CANALES: *The only way this jeopardizes you is if you don't tell the truth.*

[APPELLANT]: Okay.

DETECTIVE CANALES: *If you're telling the truth, we will get through this, okay?*

[APPELLANT]: All right.

DETECTIVE CANALES: *Do you understand these rights that I just explained to you?*

[APPELLANT]: Yes.

DETECTIVE CANALES: What I'm doing [is] I'm checking yes for you; okay?

[APPELLANT]: Yes.

DETECTIVE CANALES: *Do you want to make a statement now at this time without a lawyer? You and I are talking?*

[APPELLANT]: *Yes, we're talking.*

DETECTIVE CANALES: *Have I promised you anything, have you been offered any kind of reward or benefit or have you been threatened in any way in order to get you to make a statement?*

[APPELLANT]: *No.*

DETECTIVE CANALES: Are you under the influence of drugs or alcohol at this time?

[APPELLANT]: No.

DETECTIVE CANALES: What I'm asking you [to do] right now is basically put your initials on those lines right there.

[APPELLANT]: Okay.

DETECTIVE CANALES: Okay. I need you to sign right here. Okay. What's the highest level of education you completed?

[APPELLANT]: I completed the twelfth grade.

DETECTIVE CANALES: Okay. Twelfth grade.

[APPELLANT]: I was taking courses and everything.

DETECTIVE CANALES: Okay. Now I will just ask you a couple of quick questions; okay[?] You sure you feel okay right now? *Is there anything I can do for you right now before we get started on this at all?*

[APPELLANT]: I'm okay.

(Emphasis added).

Appellant signed the "ADVICE OF RIGHTS AND WAIVER" form at 4:55 a.m. on August 31, 2002. Thereafter, according to Canales, appellant "talk[ed] freely" about "the murders of James Arnauld [sic] and Elizabeth Magruder." According to Canales, appellant did not "ask to stop," he did not "say he would not talk," and he did not "ask for a lawyer."

Nor did appellant "ask to speak to any family members at any time."

After waiving his *Miranda* rights, appellant denied having any mental health issues. The following exchange is pertinent:

DETECTIVE CANALES: Are there any issues with you, and I mean I'm asking the question because you and I both know right now that there is an allegation of some possible mental health issues with you.

[APPELLANT]: *There is no mental health issue.*

DETECTIVE CANALES: Are you sure?

[APPELLANT]: *I don't have any.*

DETECTIVE CANALES: Okay, there's no, you don't believe you're, you're God, you don't think the end of the world is coming, I mean as far as, you know, tomorrow or anything?

[APPELLANT]: No, I mean I am moved by him [i.e., God] but I don't believe that I am God because. . . .

DETECTIVE CANALES: I understand that, but right, as far as you're concerned, *are there any mental issues?*

[APPELLANT]: *No, I don't have any.*

(Emphasis added).

During the interview, appellant explained what occurred at his parents' house on the evening of August 29, 2002. According to appellant, he and his friend, Anthony Kromah, were reading the Bible in his parents' basement when, "all of a sudden," he "heard a boom, like a door bust open," and then "two Sheriff people came in." He recalled that the sheriffs "came as [a] force. They said you must see our judge." Appellant said he asked the sheriffs if they had "any paperwork," and they responded, "No, we don't have any paperwork. No, we don't have a warrant."

Appellant also stated: "I was reading the scripture that said that your God will provide you the force or whatever you have to do. God will provide you the right. All you have to do is just ask him." Appellant explained that, as the sheriffs ap-

proached, he kept the scripture in mind and "stood up and, you know they came at me [with] force and I just like ran and I kind of spinned and ran upstairs, and I was running. . . ." Logan recalled: "I'm running towards upstairs, and then as I see my hand was provided with a tool or something." According to appellant, the tool was "a gun," which "just appeared in my hand." He described the gun's presence as "spiritual or something."

Logan stated that the gun "was originally . . . in the closet . . . in my old [bed]room," and it appeared in his hand when he was running "towards the room." He recalled that, in the upstairs bedroom, he "close[d] the door and then I open the door and I see that [the sheriffs] pulled they're pulling out theirs [i.e., their guns], and I'm just, I just did, I mean it was like a force, it wasn't really me." Logan elaborated: "I just started shooting. . . . I didn't feel I was the one shooting. . . . It didn't feel like it was really me shooting." He added: "I was commanded it wasn't just me."

During the interview, appellant admitted that he intended to kill the sheriffs:

DETECTIVE CANALES: Okay, so when you shot them, I mean, it was with the intention [of] hurting them, was the intention on basically getting rid of them altogether?

[APPELLANT]: *It was intentional* on, yeah, to put them down, boom, just you know what I'm saying.

DETECTIVE CANALES: When you say put them down, I mean you come out and—

[APPELLANT]: *I came out intending to do it.*

DETECTIVE CANALES: *Intended to kill them?*

[APPELLANT]: *Yeah.*

\* \* \*

DETECTIVE CANALES: [Y]ou knew what you were going to do when you went into the [bed]room, right?

[APPELLANT]: Um-huh.

DETECTIVE CANALES: Who made the decision to do that?

[APPELLANT]: I did.

Canales asked appellant why he did not "just run out the back door of the house" or "go out the window." Appellant reiterated: "[I]t was actually, it was a force ... I was commanded by my God I had a purpose...." Canales also discussed the effect of the Bible on appellant:

DETECTIVE CANALES: Okay, now so you're saying so you're reading [the Bible passage], you're not actually hearing voices in your head?

[APPELLANT]: I'm reading it but it was actually moving me.

DETECTIVE CANALES: It's moving you.

[APPELLANT]: Yeah.

DETECTIVE CANALES: So, you're reading it, you're feeling what you're reading, but there's not voices in your head? I'm asking because once again—

[APPELLANT]: *Right. No voices in my head, but I'm actually being moved though.*

DETECTIVE CANALES: Okay.

[APPELLANT]: By what I'm reading is actually getting to me.

DETECTIVE CANALES: Okay.

[APPELLANT]: *I don't hear voices in my head.*

DETECTIVE CANALES: So, just moved by what you're reading.

[APPELLANT]: Yeah.

DETECTIVE CANALES: And when you say moved, moved spiritually?

[APPELLANT]: Moved spiritually, yeah.

DETECTIVE CANALES: Okay.

[APPELLANT]: Very deeply. And then all of a sudden I look up and here they [i.e., the sheriffs] come running down the stairs.

(Emphasis added).

Appellant clarified his view of what the scripture said:

[APPELLANT]: ... After I read the scripture and everything and I mean [it said] they would be exposed, the way the [sic] want to come to you, and this and that your people are in danger.

DETECTIVE CANALES: ... I want to make sure what it is that you're telling me about what you read. Okay, what was that again, he will ... be exposed?

[APPELLANT]: Yeah ... a person of a stiff neck nature.

DETECTIVE CANALES: Yeah, and that's what I want to know, everything that, you know, you will be a person of a stiff neck nature.

[APPELLANT]: Yeah, and I'm reading it, and it said ... something like now that you know that, you have a responsibility, you must take, you must take care of it by any means necessary, because your people are in danger.... [Y]ou must handle it by, by any means, and I will grant you the force or the power to do whatever you have to do.

The interview ended at approximately 7:28 a.m., when appellant was "taken to the restroom, [and] subsequently taken to the Department of Corrections." Canales denied that he made "any promises, threats, or inducements" to appellant to elicit the statements.

On cross-examination, Canales acknowledged that, at the Hospital, he was informed that a lawyer was there to see appellant. The attorney was not brought back to see appellant in the emergency room, however, because appellant never requested an attorney. Moreover, Canales admitted that he never spoke to appellant's parents, even though Canales told appellant during the interview that he had spoken with them.

Appellant's counsel questioned Canales about his statement to appellant after the *Miranda* advisement that "the only way

this jeopardizes you is if you don't tell the truth[.]" The following colloquy is pertinent:

[COUNSEL FOR APPELLANT]: [Y]ou're saying to [appellant] you have the right to remain silent. If you choose to give up this right, anything that you say can be used against you in court; correct?

[DETECTIVE CANALES]: That's correct, sir.

[COUNSEL FOR APPELLANT]: Now when you say that or you read that and you read that to a suspect and you also read to them . . . the only way this jeopardizes you is if you don't tell the truth; okay. Aren't you in effect—*weren't you telling him that if he told the truth everything will be all right?*

[STATE]: Objection.

THE COURT: Overruled.

[DETECTIVE CANALES]: No, sir.

[COUNSEL FOR APPELLANT]: What were you telling him, sir?

[DETECTIVE CANALES]: *I was telling him if you tell the truth, I believe you can't go wrong any time you tell the truth. That helps the finder of fact to tell the truth.*

[COUNSEL FOR APPELLANT]: The only way this jeopardizes you is if you don't tell the truth?

[DETECTIVE CANALES]: [H]e doesn't jeopardize himself with me as far as anything is concerned regarding that statement. I'm not the one whose going to punish him in any way. It's no punishment attached to it.

\* \* \*

[COUNSEL FOR APPELLANT]: *He had not yet initialed the [Advice of Rights] form, had he?*

[DETECTIVE CANALES]: *That's correct, sir.*

[COUNSEL FOR APPELLANT]: He had not?

[DETECTIVE CANALES]: I don't believe he had, sir.

[COUNSEL FOR APPELLANT]: And until a person is advised of these rights and initials the form, you can't proceed with questioning, could you?

[DETECTIVE CANALES]: That's correct, sir.

(Emphasis added).

Prince George's County Police Lieutenant Daniel Lipsey was the State's final witness. Lipsey, who was on the scene when appellant was apprehended, recalled: "The defendant was taken from the shed that we apprehended him in, pulled out, placed against a dumpster that was right next to it, handcuffed, and then patted down. At that point when we found out it was [sic] no weapons on him, he was transported by two officers" to the Hospital. Lieutenant Lipsey denied "hear[ing]" anybody make any promises or inducements" to appellant or hearing appellant request a lawyer. While appellant was in his presence, neither he nor any other officer advised appellant of his rights.

Appellant called two witnesses: Scott Little, Esquire and Karen Logan, appellant's mother.

Little stated that, prior to appellant's arrest, he was retained by appellant's parents to represent appellant. Following appellant's arrest, Little went to the Hospital, but was not able to see appellant. Little recalled that he told a police officer that he wanted to speak to appellant "immediately as soon as they were done with whatever treatment they were doing." According to Little, the officer "said as soon as they're finished, he'd come back and get me and I can talk to my client." About twenty minutes later, that officer "came back" and "told [Little] that Mr. Logan was no longer at the hospital" and that "he had been taken over to the ... police station."

At the police station, Little informed two officers that he "wanted to see Mr. Logan," but his requests were denied. Little estimated that he remained at the station approximately "three hours," all the while "being unable to see" appellant.

Appellant's mother testified that, on August 30, 2002, the day after the shootings, she and her husband retained Mr. Little. Mrs. Logan recalled that, on the night of appellant's arrest, she and her husband went to the police station at approximately 2:35 a.m., and were told that appellant had been taken to the Hospital. They arrived at the Hospital and told security that they wanted to see appellant. But, after waiting "almost an hour," they were informed that appellant had been taken to the police station. They then returned to the station for the second time. While there, Little asked to see appellant, but the "gentleman that he spoke to told him that [appellant] had not requested a lawyer." Mrs. Logan and her husband remained at the station "at least maybe thirty minutes" and they never saw appellant.

The court then heard argument.[9] As to the alleged "Miranda, advice of rights, and waiver" violation, appellant emphasized that he was not focusing on voluntariness. He asserted: "Unlike the voluntariness standard which tolerates substantially official pressure[,] *Miranda* waivers are to be a free will decision," without "police manipulation." (Emphasis added).

The court questioned appellant's counsel about Detective Canales's post-*Miranda* statement to appellant that "the only thing that may jeopardize you is if you don't tell the truth." The following exchange is pertinent:

THE COURT: How does that mislead when he's also advised you have the right to stop at any time?

[COUNSEL FOR APPELLANT]: Well, its [sic] misleading when you say on [the] one hand anything that you say can and will be used against you and on the other hand say the

---

9. At the outset, appellant's counsel set forth the various grounds upon which appellant sought suppression, most of which are not pursued on appeal:

> [One,] *Miranda* advice and waiver. Two, voluntariness. Three, *Lowdowski*, right to counsel Fifth Amendment. We're also going to be arguing right to counsel Sixth Amendment and we're going to throw in the cite of *McCarther v. State*, the Public Defender law, Article 27, Section 4 which is the broader right to counsel under federal law.[1]

only thing—the only way that jeopardizes you is [if] you don't tell the truth.

THE COURT: *[C]an't [that] be interpreted to mean if you decide to talk, the only problem will be if you don't tell me the truth[?]*

[COUNSEL FOR APPELLANT]: *That could be interpreted that way.* The interpretation that way the only problem ... is *if you don't tell me the truth and you lie, the inference you can draw from that is that is admissible in evidence. If you do tell the truth, it won't be—you won't jeopardize yourself. How else does the phrase jeopardy have any meaning?*

THE COURT: *You're not talking about a lawyer using that language.*

[COUNSEL FOR APPELLANT]: But the State has the burden and the burden that they say in *Miranda* is the burden. They have to[ ] in effect say [there's] no possible way that could be interpreted to mean that if you tell him the truth it wouldn't be used against him in evidence. They have the burden, not the defense.

\* \* \*

I'm saying that there's a substantial disagreement that you can read into that as to whether or not that means if you don't tell the truth, it won't be used against you [sic]. It was misleading. In that respect it was deceptive.... [T]his waiver was involuntary in light of that.

(Emphasis added).

Referring to *Hart v. Attorney General of the State of Florida*, 323 F.3d 884 (11th Cir.), *cert. denied sub nom., Crist v. Hart*, 540 U.S. 1069, 124 S.Ct. 813, 157 L.Ed.2d 733 (2003), in which the police officer told the suspect, "Honesty won't hurt you," appellant's lawyer stated:

They [i.e., the 11th Circuit] granted a writ [of habeas corpus] after a state court denied and after a federal district court denied relief, they reversed everybody and suppressed

a statement finding that the statement was taken in violation of *Miranda* on the advice of rights form.

\* \* \*

What the court said in response to that at the Eleventh Circuit [is that t]elling him that honesty wouldn't hurt him contradicted the *Miranda* warning that anything he said could be used against him in court.... It's the same thing here. *Honesty will not hurt you is no different in substance than saying the only way this jeopardizes you is if you don't tell the truth.* It's just the flip side of the same meaning.

\* \* \*

[A]nd again, the point that they make is that a *Miranda* warning as opposed to traditional voluntariness and *Miranda advice* will not look or *will not tolerate any misleading or any kind of deception whatsoever as opposed to . . . what [is] allowed you in terms of traditional voluntariness.*

(Emphasis added).

The State countered that, under the totality of the circumstances, appellant's statements were admissible. It referred the court to Maryland cases in which, on traditional voluntariness grounds, the appellate courts affirmed various exhortations to tell the truth. The State argued:

[Appellant] leaves the hospital after approximately an hour and forty minutes. Approximately at 3:40 [a.m.] . . . He's taken back to CID arriving somewhere in the area around right before 4 a.m. . . . And he's taken, again, filmed, no discussion, no promise, no threats, no inducements. Taken right to the interview room where he's filmed. You can see it in the beginning of the tape....

This is where the handcuffs are being taken off. He's put in the room. He's just sitting there. Wide awake. Alert. Waiting. Hanging out for approximately 15 minutes if you want to time it. Until Detective Canales comes in the room and starts discussing, talking to the defendant....

Clearly it's a totality. That's the law, Your Honor. . . .

I want the court to look at the totality of this statement from everything that's said from Detective Canales and back to the defendant. He's treated with kid gloves immediately. Filmed. Taken right to the hospital. Right back to CID. On film the entire time. Anything we can do for you he's told. Food. Drink. . . . Great rapport going on between the defendant and Detective Canales. It's no time I don't want to talk to you. No hesitation between the defendant. He's freely and voluntarily talking. It can't be any thought about it when you look at the nature of the conversation. That's why it's wonderful that [it] is done on tape and Your Honor has a chance to see it. There was no type of coersion [sic], any type of physical threats. It's no type of mental coersion [sic] in any way. They are having a very easy going conversation back and forth. Detective [Canales] gets lots of background information. You hear that. That's again an element the court has to decide for . . . the totality of the circumstances for *Miranda* and also for the voluntariness of the statement.

His background. You hear he has a twelfth grade education. He's worked at a computer place. He talks about his drug history.

\* \* \*

*He has a very sophisticated vocabulary back and forth. The defendant asked open ended questions. What rights right out of the defendant's mouth. Miranda. He knows about Miranda rights from the getgo. We know the defendant has just been arrested for a felony drug charge three weeks earlier in the beginning of August. This happens at the end of August.*

*So clearly here's a person who knows. He went to the Commissioner and he's told about all his rights. This is a person who shows sophisticated understanding as opposed to some of the defendants. . . . And then we begin the back and forth with the conversation. All the background leading up to the Miranda [waiver]. And the defendant—*

*counsel seems to skip over the Miranda form and every-*
*thing that goes in it.* And so even the *Hart* case cited by
counsel indicates how the court is supposed to determine
[the validity of] the *Miranda* violation. By the totality of
the circumstances.

*Defendant may waive rights conveyed in the warnings*
*provided the waiver is voluntary knowingly and intelligent-*
*ly. First the relinquishment of the right must be voluntary*
*in the sense that it's the product of a free and deliberate*
*choice rather than intimidation, coersion [sic], or decep-*
*tion. We don't have any of that here.*

*The waiver must have been made with a full awareness*
*of both the nature of [the] right [to] the decision to abandon*
*[Miranda and] the consequences of the decision to abandon*
*[Miranda]. . . . .*

\* \* \*

*This is strong proof, Your Honor, the advice of rights form*
*that Your Honor has. . . . That it is very strong proof that*
*the defendant knew his rights and waived them.*

Moreover, *as you look at the totality of the circumstances*
*he (A) knows his Miranda rights. Knows he has a right to*
*remain silent and (B) he's read that exact sentence prior to*
*this issue about the jeopardy which I'll address in a second.*
*And he said I know anything I say may possibly be used*
*against me.* As he indicates, you see his head when you
look at the video. *He indicates affirmatively. He indi-*
*cates that he knows all. That he knows his rights.* He's
willing to talk to the Detective *and the big thing about the*
*defendant when he's talking to Detective Canales is honesty.*
*Detective Canales is going along with it. I want you to be*
*honest and I'll be honest with you. Its [sic] going back and*
*forth on this honesty issue.*

\* \* \*

. . . So I don't see how from the totality of the circum-
stances the court can rule that this is not a person from his

sophistication and level did not understand his rights and did not freely and voluntarily waive them and want to talk to Detective Canales and told his side of the story....

(Emphasis added).

In rebuttal, appellant suggested that the State had focused improperly on: "exhortation under traditional voluntariness," which had "nothing to do with *Miranda* advice of rights and waiver." He clarified that he was not relying on "the Fifth Amendment due process analysis...."

On October 7, 2003, the court orally denied appellant's motion to suppress. As to the alleged *Miranda* violation, the court reasoned: [10]

[The] Court ... finds that based on the totality of the circumstances surrounding the taking of the *Miranda* waiver, that the waiver of the *Miranda* rights were [sic] voluntary, ... knowing and intelligent. And this was an uncoerced choice. It was a sufficient level of comprehension of his rights and that he knowingly and voluntarily waived those rights.

The colloquy concerning the police officer's admonition to be truthful did not in any way viciate [sic] that. Its [sic] simply an urging by the police officer to be truthful. Consequently the court will deny the motion to suppress.

(Emphasis added).

## II. THE *MIRANDA* WAIVER

Appellant challenges the legality of the *Miranda* advisement. He contends: "The deception employed by the police, particularly in light of the lengthy colloquy between the police and [appellant] prior to the giving of *Miranda* rights vitiated [appellant's] rights and nullified his waiver." While acknowledging that a " 'degree of police deception to obtain a confession is tolerated[,]' " appellant insists that "courts around the

---

10. Because appellant appeals only from the court's denial of suppression on *Miranda* grounds, we need not recount the court's reasoning as to other grounds.

country have held that the type of deception employed here by the police is not to be tolerated and serves to vitiate the *Miranda* warnings and render any waiver of them invalid."

In particular, Logan argues:

Prior to the giving of the constitutionally required *Miranda* warnings, the Detective repeatedly advised Mr. Logan that the two "were just talking" and that the officer was not looking to hurt Mr. Logan. He lied to Mr. Logan about the safety of his family. Worse still, when Mr. Logan asked whether he might be better off with the assistance of counsel, *the Detective completely contradicted the warnings and told Mr. Logan that truthful statements concerning the commission of criminal acts would not jeopardize him, so long as he told the truth. Quite obviously, this statement stood in stark contrast to the warning of Miranda that any statement could be used against Mr. Logan in court. . . .* The police deceived Mr. Logan into believing that "honesty would not hurt him" and that the statements made were nothing more than Mr. Logan and Detective Canales "just talking," suggesting that the conversation was somehow off the record. It is not insignificant that Detective Canales was aware that Mr. Logan might suffer from a mental illness and the colloquy prior to the giving of the *Miranda* warnings, in and of themselves constitutionally troublesome, *reeks of rendering the warnings useless.*

(Emphasis added).

Emphasizing that his argument is not predicated on traditional voluntariness, appellant explains that "the question is not whether Mr. Logan's will was overborne but, rather, whether the *Miranda* warnings he received were effectively nullified by Detective Canales' erroneous statement that he could be jeopardized by what he said *only* if he failed to speak truthfully." Accordingly, appellant argues that the trial court erred in failing to suppress his statements, because his "waiver of his *Miranda* rights was not a knowing, intelligent, and voluntary choice in light of the police deception in this case."

In his reply brief, appellant elucidates his contention:

The point ... is not that Mr. Logan's statement was involuntary in the constitutional sense but, rather, that *the Miranda warnings he received prior to making that statement were infirm.* Although Detective Canales told Mr. Logan that he had the right to remain silent, did not have to answer any questions, and that any statement he made could be used against him in court, *he effectively vitiated those warnings by reassuring Mr. Logan that, as long as he told the truth about committing the crimes, no harm would befall him. Quite obviously, this was a direct contradiction of the constitutionally required advisement* that any statement Mr. Logan made could be used against him in court *and wholly undermined the significance of the right to remain silent.*[11]

(Emphasis added).

The State counters that the court "properly denied Logan's motion to suppress his statement." Looking to the totality of

---

11. We pause to note that appellant does not rely on *Missouri v. Seibert,* 542 U.S. 600, 124 S.Ct. 2601, 159 L.Ed.2d 643 (2004), which was decided several weeks before appellant filed his opening brief in this matter. In *Seibert,* the Supreme Court held that, when a two-step interrogation strategy is deliberately used, in which the police purposefully withhold *Miranda* warnings until after an incriminating statement is made, then give proper *Miranda* warnings, secure a proper waiver, and elicit a second confession, the second confession must be suppressed because a "midstream recitation of warnings after interrogation and unwarned confession could not effectively comply with *Miranda's* constitutional requirement...." 124 S.Ct. at 2605; *see also Cooper, supra,* at 73, 877 A.2d 1095.

Appellant does not claim error in the timing of the advisement, nor does he argue that the background inquiry was part of one continuous interrogation. Moreover, Logan does not suggest that Canales intentionally primed appellant with seemingly innocuous questions and comments in the background phase to induce him to waive *Miranda.* Significantly, unlike in *Seibert,* in which the police engaged in a deliberate strategy, appellant's counsel argued below: "I'm not saying [Canales] did it deliberately.... It's irrelevant whether he thought he was doing anything wrong." Furthermore, the court below never found that Canales deliberately engaged in an improper strategy as a ploy to induce the waiver of rights.

For these reasons, we shall not consider *Seibert* or *Cooper* in our analysis.

the circumstances, it asserts "that this was not, by any stretch, a threatening interrogation."

Despite appellant's claim that his contention is not based on traditional voluntariness, the State seems to focus on that concept. It argues that "the totality of the circumstances here indicate that Logan gave a voluntary statement to Canales after making a voluntary and knowing waiver of his Miranda rights." The State adds: " ' "When the issue is voluntariness, the failure of a defendant to testify almost forecloses any chance of prevailing.... Without such testimony, there is usually no direct evidence of involuntariness." ' " (Quoting *Uzzle v. State,* 152 Md.App. 548, 571–72, 832 A.2d 869, *cert. denied,* 378 Md. 619, 837 A.2d 929 (2003) (quoting *Ashford v. State,* 147 Md.App. 1, 56, 807 A.2d 732 (2002))). In support of its position, the State observes:

Logan signed the *Miranda* form provided to him, acknowledging that he understood his rights. Logan proceeded to talk "freely" about shooting Arnaud and Magruder. During the three-and-a-half hour interrogation, Logan never requested an attorney nor expressed a desire to remain silent. Logan's statement was not induced by threats or promises. In fact, nowhere in the record does there exist an identifiable quid pro quo typical of a coercive tactic.

Furthermore, the record indicates that Detective Canales never deceived Logan into waiving his rights or giving a statement. Canales specifically told Logan that he had the right to remain silent, that he did not have to answer any questions, and that he could stop answering questions at any time during the interrogation. He warned Logan, however, that any statement he made could be used against him in court. Logan stated explicitly that he understood these rights before he made his statement.

Alternatively, the State asserts: " '[T]he admission of an "involuntary" confession at trial is subject to harmless-error analysis.' " It argues:

Logan's complicity in the murders of Deputy James Arnaud and Deputy Elizabeth Magruder was undisputed.

Even Logan concedes that the core issue in this case was the "battle" between the experts on the "insanity issue," . . . and Logan's statement had no material impact on this aspect of the case. Accordingly, even if it was error to admit Logan's statement, such error, under the circumstances, was harmless beyond a reasonable doubt.

(Citation omitted).

In light of his NCR defense, appellant challenges the State's "harmless error" analysis. He argues:

[I]t cannot be said that the introduction of Mr. Logan's confession was harmless considering that the State made a tactical decision to utilize Mr. Logan's confession in its case in chief, notwithstanding that criminal agency was not in dispute. The net effect of the statement's introduction into evidence was to portray Mr. Logan as a "normal" person, having a conversation with detectives in an interrogation room, and admitting to intentionally shooting the two victims. Thus, contrary to what the State suggests, Mr. Logan's confession did not merely pertain to the guilt/innocence issue, but was affirmatively used by the State as a preemptive strike against Mr. Logan's defense that he was not criminally responsible. As such, its admission into evidence cannot be considered harmless beyond a reasonable doubt.

■■■■ Our review of the trial court's ruling with respect to a suppression motion is based solely on the record of the suppression hearing. *State v. Collins,* 367 Md. 700, 706–07, 790 A.2d 660 (2002); *Cartnail v. State,* 359 Md. 272, 282, 753 A.2d 519 (2000); *Cooper v. State,* 163 Md.App. 70, 84, 877 A.2d 1095 (2005); *Freeman v. State,* 158 Md.App. 402, 408 n. 3, 857 A.2d 557 (2004). We review the evidence in the light most favorable to the State as the prevailing party. *State v. Rucker,* 374 Md. 199, 207, 821 A.2d 439 (2003); *Riddick v. State,* 319 Md. 180, 183, 571 A.2d 1239 (1990); *Whittington v. State,* 147 Md.App. 496, 515, 809 A.2d 721 (2002), *cert. denied,* 373 Md. 408, 818 A.2d 1107 (2003), *cert. denied,* 540 U.S. 851, 124 S.Ct. 136, 157 L.Ed.2d 92 (2003). Moreover, we extend

great deference to the fact-finding of the motion court, accepting the facts as found, unless clearly erroneous. *State v. Green*, 375 Md. 595, 607, 826 A.2d 486 (2003); *Ferris v. State*, 355 Md. 356, 368, 735 A.2d 491 (1999).

■ Nevertheless, we must make our own independent constitutional appraisal as to the admissibility of a defendant's statements by reviewing the law and applying it to the facts of the case. *Crosby v. State*, 366 Md. 518, 526, 784 A.2d 1102 (2001), *cert. denied*, 535 U.S. 941, 122 S.Ct. 1325, 152 L.Ed.2d 233 (2002); *Wilkes v. State*, 364 Md. 554, 569, 774 A.2d 420 (2001). We accomplish this by conducting a *de novo* review of the law and applying it to the first-level facts found by the suppression judge. *Nathan v. State*, 370 Md. 648, 659, 805 A.2d 1086 (2002), *cert. denied*, 537 U.S. 1194, 123 S.Ct. 1303, 154 L.Ed.2d 1029 (2003); *Green*, 375 Md. at 607, 826 A.2d 486; *In re David S.*, 367 Md. 523, 529, 789 A.2d 607 (2002).

· ■ When the prosecution seeks to introduce a defendant's custodial statements, the State must establish, *inter alia*, that the statement was obtained in conformance with the dictates of *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). *See Missouri v. Seibert*, 542 U.S. 600, ——, 124 S.Ct. 2601, 2608 n. 1, 159 L.Ed.2d 643 (2004); *Winder v. State*, 362 Md. 275, 305–06, 765 A.2d 97 (2001). As the Court of Appeals recently stated, "it is now clear that the requirements of *Miranda* are of Constitutional dimension." *Taylor v. State*, 388 Md. 385, 400 n. 7, 879 A.2d 1074 (2005) (citing *Dickerson v. United States*, 530 U.S. 428, 440, 120 S.Ct. 2326, 147 L.Ed.2d 405 (2000)). There is no prescribed form or set way in which to waive *Miranda* rights, however. As the Supreme Court said in *North Carolina v. Butler*, 441 U.S. 369, 373, 99 S.Ct. 1755, 60 L.Ed.2d 286 (1979): "The question is not one of form, but rather whether the defendant in fact knowingly and voluntarily waived the rights delineated in the *Miranda* case."

The Supreme Court has set out a two-fold inquiry concerning the validity of a defendant's waiver of *Miranda* rights:

First, the relinquishment of the right must have been voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion, or deception. *Second, the waiver must have been made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it.* Only if the "totality of the circumstances surrounding the interrogation" reveals *both an uncoerced choice and the requisite level of comprehension* may a court properly conclude that the *Miranda* rights have been waived.

*Moran v. Burbine,* 475 U.S. 412, 421, 106 S.Ct. 1135, 89 L.Ed.2d 410 (1986) (citation omitted) (emphasis added).

■ Accordingly, before the government may introduce a defendant's uncounselled statement, made during custodial interrogation, it must show that the suspect made a voluntary, knowing, and intelligent waiver of his privilege against self-incrimination. *Miranda,* 384 U.S. at 475, 86 S.Ct. 1602 (stating that, when the government seeks to rely on a waiver of rights, it carries "a heavy burden" to show "that the defendant knowingly and intelligently waived his privilege against self-incrimination . . . ."); *see Seibert,* 124 S.Ct. at 2609–10 (*"Miranda* addressed 'interrogation practices . . . likely . . . to disable [an individual] from making a free and rational choice' about speaking, and held that a suspect must be 'adequately and effectively' advised of the choice the Constitution guarantees.") (citations omitted; alteration and omissions in *Seibert* ); *Davis v. United States,* 512 U.S. 452, 458, 114 S.Ct. 2350, 129 L.Ed.2d 362 (1994) (stating that *Miranda* " 'requir[es] the special protection of the knowing and intelligent waiver standard.' ") (citation omitted) (alteration in *Davis* ). As the Court of Appeals said in *McIntyre v. State,* 309 Md. 607, 614–15, 526 A.2d 30 (1987), "In undertaking to prove a waiver of *Miranda* rights, 'a heavy burden rests on the government to demonstrate that the defendant knowingly and intelligently waived his privilege against self-incrimination and his right to retained or appointed counsel.' " (Citation omitted). *See also White v. State,* 374 Md. 232, 251, 821 A.2d 459, *cert. denied,*

540 U.S. 904, 124 S.Ct. 262, 157 L.Ed.2d 189 (2003); *Freeman,* 158 Md.App. at 425, 857 A.2d 557.

■■■■ In addition, the State bears the burden of establishing that an incriminating custodial statement was voluntarily made under Maryland nonconstitutional law, the Due Process Clause of the Fourteenth Amendment to the United States Constitution, and Article 22 of the Maryland Declaration of Rights. *See Winder,* 362 Md. at 305, 765 A.2d 97; *Ball v. State,* 347 Md. 156, 173–74, 699 A.2d 1170 (1997), *cert. denied,* 522 U.S. 1082, 118 S.Ct. 866, 139 L.Ed.2d 763 (1998); *Pappaconstantinou v. State,* 352 Md. 167, 172–73, 721 A.2d 241 (1998); *Hoey v. State,* 311 Md. 473, 480, 536 A.2d 622 (1988); *see also Dickerson,* 530 U.S. at 434, 120 S.Ct. 2326; *Colorado v. Connelly,* 479 U.S. 157, 166–67, 107 S.Ct. 515, 93 L.Ed.2d 473 (1986). "[T]he ultimate issue of 'voluntariness' [of custodial statements] is a legal question. . . ." *Miller v. Fenton,* 474 U.S. 104, 110, 106 S.Ct. 445, 88 L.Ed.2d 405 (1985); *see Arizona v. Fulminante,* 499 U.S. 279, 287, 111 S.Ct. 1246, 113 L.Ed.2d 302 (1991); *Baynor v. State,* 355 Md. 726, 729 n. 1, 736 A.2d 325 (1999); *Hof v. State,* 337 Md. 581, 605, 655 A.2d 370 (1995).[12] But, appellant does not challenge traditional voluntariness under the Due Process Clause or Maryland nonconstitutional law. Rather, he contends solely that the *Miranda* warnings themselves were defective, for the reasons previously articulated.

■■■■ " '*Miranda* is a more demanding standard than is traditional voluntariness. . . .' " *Matthews v. State,* 106 Md.

---

**12.** In *Winder,* 362 Md. at 307, 765 A.2d 97, the Court explained:

In cases where we are called upon to determine whether a confession has been made voluntarily, we generally look at the totality of the circumstances affecting the interrogation and confession. . . . We look to all of the elements of the interrogation to determine whether a suspect's confession was given to the police through the exercise of free will or was coerced through the use of improper means. On the non-exhaustive list of facts we consider are the length of the interrogation, the manner in which it was conducted, the number of police officers present throughout the interrogation, and the age, education and experience of the suspect.
(Citations omitted).

App. 725, 739, 666 A.2d 912 (1995), *cert. denied,* 341 Md. 648, 672 A.2d 623 (1996) (citation omitted). Indeed, " 'it is quite possible to fail the *Miranda* test and yet pass the undergirding voluntariness test.' " *Id.* (citation omitted). *See Dickerson,* 530 U.S. at 444, 120 S.Ct. 2326 (noting that "statements which may be by no means involuntary, made by a defendant who is aware of his 'rights,' may nonetheless be excluded" because of a *Miranda* violation); *Edwards v. Arizona,* 451 U.S. 477, 483, 484, 101 S.Ct. 1880, 68 L.Ed.2d 378 (1981) (holding that state court erroneously concluded that defendant's admission was voluntary, without deciding whether defendant "had knowingly and intelligently relinquished" his *Miranda* rights, and noting that "the voluntariness of . . . an admission on the one hand, and a knowing and intelligent waiver on the other, are discrete inquiries"); *Lewis v. State,* 285 Md. 705, 722, 404 A.2d 1073 (1979) (noting that, under *Miranda,* the type of police deception tolerated is "particularly" limited).

■■■ As with voluntariness, in a *Miranda* inquiry we must look to the "totality of the circumstances" to assess the validity of a suspect's waiver of rights. *Holmes v. State,* 116 Md.App. 546, 553, 698 A.2d 1139 (1997) ("Defendants may waive their *Miranda* rights provided, under the totality of the circumstances, they act voluntarily, knowingly, and intelligently"), *aff'd on other grounds,* 350 Md. 412, 712 A.2d 554 (1998). *See also Moran,* 475 U.S. at 421, 106 S.Ct. 1135; *Fare v. Michael C.,* 442 U.S. 707, 724–25, 99 S.Ct. 2560, 61 L.Ed.2d 197 (1979) ("[T]he determination whether statements obtained during custodial interrogation are admissible . . . is to be made upon an inquiry into the totality of the circumstances surrounding the interrogation, to ascertain whether the accused in fact knowingly and voluntarily decided to forego" his *Miranda* rights.); *Butler,* 441 U.S. at 374–75, 99 S.Ct. 1755 ("[T]he question of waiver must be determined on 'the particular facts and circumstances surrounding that case, including the background, experience, and conduct of the accused.' ") (Citation omitted).

■ Although "[a]n express written or oral statement of waiver of the right to remain silent ... is usually strong proof of the validity of that waiver, [it] is not inevitably ... sufficient to establish waiver." *Butler,* 441 U.S. at 373, 99 S.Ct. 1755; *see also Blasingame v. Estelle,* 604 F.2d 893, 896 (5th Cir.1979) ("Defendant's signing of the waiver form, though *not conclusive,* is 'usually strong proof' of the voluntariness of the waiver.") (Citation omitted) (emphasis added). As the Supreme Court recognized in *Seibert,* 124 S.Ct. at 2610, "it would be absurd to think that mere recitation of the litany [of *Miranda* rights] suffices to satisfy *Miranda* in every conceivable circumstance." And, in contrast to traditional voluntariness, "there is an absolute prohibition upon any trickery which misleads the suspect as to the existence or dimensions of any of the applicable [*Miranda* ] rights...." WAYNE R. LAFAVE, ET AL., 2 CRIMINAL PROCEDURE § 6.9(c) (3d.2000).

Appellant relies on *Hart v. Attorney Gen. of the State of Florida,* 323 F.3d 884 (11th Cir.2003), in which the defendant challenged the validity of his *Miranda* waiver. In that case, after the teenaged defendant was informed of his rights by one detective, he signed the waiver form and then asked to speak to another detective, with whom he was familiar. *Id.* at 887–88. When that detective arrived, the defendant asked her "opinion" as to "the pros and cons of having an attorney...." *Id.* at 888. The second detective responded "that in her opinion the pros of having an attorney were 'He'll protect your rights. He'll tell you what to answer, what not to answer, and he'll be here for you.' She told him the con in her opinion was 'I'm going to want to ask you questions and he's going to tell you you can't answer me.' " *Id.* At the suppression hearing, the detective acknowledged that while she never told the defendant that giving a statement would help his situation, she did tell him " 'honesty wouldn't hurt him.' " *Id.* at 889. The court denied the suppression motion, concluding that the appellant did not make an unequivocal request for an attorney and, consequently, the detective's colloquy with Hart did not render his waiver involuntary, unintelligent, and unknowing. *Id.* at 890, 890 n. 11.

The Eleventh Circuit subsequently granted the defendant's request for habeas corpus relief. It concluded that the waiver was invalid, as "the product of deception," and was made without "full awareness" of "the consequences of the decision...." *Id.* at 893. The court reasoned:

> In this case, Detective Mauer [i.e., the first detective] went to great lengths to apprise Hart of his rights. He testified that he went over the *Miranda* rights waiver form with Hart and carefully explained each *Miranda* warning to Hart, including that anything he said could be used against him in court. Mauer testified that Hart signed the form to indicate that he understood each right and that he was willing to answer questions without a lawyer.... *Our analysis cannot end with Hart's signing of the waiver form because we are required to examine the 'totality of the circumstances surrounding the interrogation' to determine whether Hart's decision to waive his rights was made voluntarily, knowingly, and intelligently.*[ ]

*Id.* (Citation omitted in *Hart* ) (emphasis added).

The court determined: "Although asking for the pros and cons of hiring a lawyer is not an unequivocal request for counsel, it does indicate that Hart did not fully understand his right to counsel and was asking for clarification of that right." *Id.* at 894. Of import here, the court also addressed the significance of the second detective's comment to the defendant that "honesty wouldn't hurt him." The court said:

> *Telling him that "honesty wouldn't hurt him" contradicted the Miranda warning that anything he said could be used against him in court.*[ ] *The phrase "honesty will not hurt you" is simply not compatible with the phrase "anything you say can be used against you in court." The former suggested to Hart that an incriminating statement would not have detrimental consequences while the latter suggested (correctly) that an incriminating statement would be presented at his trial as evidence of his guilt.*

*Id.* (Emphasis added).

The Eleventh Circuit concluded, *id.* at 895 (emphasis added):

*Given the totality of the circumstances surrounding the interrogation, which include Hart's trust of Schuster [i.e., the second detective] and Schuster's statements contradicting the Miranda warnings, we cannot say that Hart's decision to waive his rights and confess was voluntary, knowing, and intelligent. His decision to waive his rights and confess was the product of Schuster's deception and, as a result of her contradictory statements,* he did not truly understand the nature of his right against self-incrimination or the consequences that would result from waiving it. *Therefore, his waiver was' not voluntary, knowing, and intelligent as required by Miranda,* and the state court's failure to apply the correct legal standard to this issue resulted in a decision that was contrary to clearly established federal law, as determined by the Supreme Court.

Appellant also refers us to the Eleventh Circuit's decision in *United States v. Beale,* 921 F.2d 1412 (11th Cir.), *cert denied,* 502 U.S. 829, 112 S.Ct. 99, 100, 116 L.Ed.2d 71 (1991). In that case, the defendants were convicted in federal court of participating in a racketeering organization that committed a series of armored truck robberies in Florida between 1982 and 1985. *Id.* at 1419. Of the nearly one hundred witnesses who testified at the trial, most were either witnesses to the robberies or federal law enforcement officials who investigated them. *Id.*

On appeal, one of the defendants, Francisco Lavin, a native of Cuba, claimed that he did not understand his constitutional rights and "signed the waiver form only after the FBI agents told him that signing the form would not hurt him." *Id.* at 1434. Lavin had a fifth grade education and did not speak English or read Spanish. *Id.* However, an FBI agent, certified in speaking Spanish, had testified that he was present when another agent, a native Spanish-speaker, orally advised Lavin of his *Miranda* rights in Spanish and provided Lavin with a waiver form in Spanish. *Id.* According to the agent, Lavin signed the form after he read it and stated that he understood it. *Id.*

The appellate court concluded that the trial court erred by admitting the statements made by Lavin after he signed the waiver form, but determined that the error was harmless. *Id.* at 1435. Significantly, the court ruled that the waiver was not "voluntary, knowing and intelligent," *id.*, because Lavin "signed the waiver only after the agent told him that signing the form would not hurt him. . . ." *Id.* at 1435. The Eleventh Circuit reasoned:

Although the Supreme Court has held that the police do not have to recite the *Miranda* warnings in a talismanic fashion, the warnings must not be misleading. . . . *It appears that by telling Lavin that signing the waiver would not hurt him the agents contradicted the Miranda warning that a defendant's statements can be used against the defendant in court, thereby misleading Lavin concerning the consequences of relinquishing his right to remain silent.* . . . . Accordingly, the district court erred by admitting Lavin's statement.

*Id.* (Emphasis added) (citations omitted).

Nevertheless, the court was satisfied that "the remaining evidence is not only sufficient to support the conviction but so overwhelming as to establish Lavin's guilt beyond a reasonable doubt." *Id.* at 1435. Accordingly, it found the error harmless.

Additionally, appellant relies on *State v. Stanga*, 617 N.W.2d 486 (S.D.2000). In that case, the defendant was charged with burglary, simple assault, and violating a domestic protection order. *Id.* at 488. During the advisement of *Miranda* rights, the detective assured the defendant "that any statement he gave was 'between you and me,' signifying that it would not go beyond the interrogation room." *Id.* at 487. Furthermore, to induce the defendant to talk, the detective told the defendant, " 'you need to get this off your chest.' " *Id.* at 489. When the defendant told the detective, " 'I know you're here to get something against me[,]' " the detective responded: " 'No, I'm here for you and I to talk.' " *Id.* The detective also assured the defendant, " 'You can trust me straight up.' " *Id.*

The defendant sought to suppress his confession, claiming he did not make a knowing, intelligent, and voluntary waiver of his *Miranda* rights. *Id.* at 487. In particular, the defendant contended that "the required *Miranda* warning that any admission can be used in court was subverted by the suggestion that admissions would not be used against him." *Id.* The court determined that the trial court erred by admitting the defendant's confession, but found the error harmless. *Id.* at 491. Of import here, the *Stanga* Court explained:

After giving the *Miranda* warning to Stanga, [Detective] Lubbers repeatedly contradicted the admonition that anything Stanga said could be used against him. *Lubbers told Stanga twelve times that what was said during the interrogation was between the two of them.* In the suppression hearing and in the trial, Lubbers admitted that he lied to Stanga when he told him that what he said would not go any further than the interview room.

*Some of the detective's comments were equivocal and might fairly be characterized as sympathetic colloquialisms ...,* but *several of the assurances clearly crossed the line.* When Stanga said that he knew that Lubbers was there to get something against him and Lubbers responded "No, I'm here for you and I to talk," that and comments like it nullified the *Miranda* warnings. *Although trickery is sometimes a legitimate interrogation technique, Miranda warnings are a "concrete" prerequisite to custodial interrogation and may not be manipulated through deception.*

*Id.* at 490–91 (Emphasis added).

*United States v. Cohen,* 372 F.Supp.2d 340 (E.D.N.Y.2005), is also noteworthy.[13] In that case, the defendant, who was charged with sexual assault of a fellow airline passenger, moved to suppress statements made outside of the plane and at the police station, contending that the statements were obtained in violation of his *Miranda* rights. *Id.* at 340–41. In particular, the defendant claimed that, during the administra-

---

13. We note that in *Cooper v. State, supra,* this Court disagreed with *Cohen,* but on an issue not pertinent here.

tion of the *Miranda* warnings, he asked the detective whether he needed a lawyer and, in response, the detective shrugged, motioned with his hands that it was up to the defendant, *id.* at 347, and told him "if you have nothing to hide, then you do not need a lawyer." *Id.* at 348. The defendant argued that the detective's statement was "the equivalent of telling the suspect that 'honesty wouldn't hurt him,' a phrase found by the Eleventh Circuit [in *Hart* ] to contradict *Miranda's* admonition that anything the suspect says can be used against him." *Id.* at 359–60 (citation omitted).

The federal trial court agreed that " 'deceptive stratagems such as giving false legal advice' . . . render[ ] a [*Miranda* ] waiver invalid[.]" *Id.* at 360 (citation omitted). But, the court concluded that the detective's statement was "not a misstatement of the law," *id.,* and denied the defendant's motion to suppress. *Id.* at 361. The *Cohen* court distinguished the matter before it from *Hart,* reasoning, *id.* at 360–61:

> For every suspect, "if you have nothing to hide, then you don't need a lawyer" is always true. An individual that has not committed a crime cannot make incriminating statements. On the other hand, "honesty will not hurt you" is only true for suspects that have not committed a crime, but is always false for those that have. The distinction between these statements, then, is that one is true and [the other] is not. And only "affirmative misrepresentations by the police" are prohibited by *Miranda,* not "ploys to mislead a suspect or to [l]ull him into a false sense of security that do not rise to the level of compulsion or coercion [.]" *[United States v.] Anderson,* 929 F.2d [96,] 100 [ (2d Cir.1991) ], *quoting Illinois v. Perkins,* 496 U.S. 292, 297, 110 S.Ct. 2394, 110 L.Ed.2d 243 (1990). The combination of "if you have nothing to hide" and a shrug is not an affirmative misrepresentation or misstatement of the law.

*United States v. Chadwick,* 999 F.2d 1282 (8th Cir.1993), also provides guidance. In *Chadwick,* the defendant was indicted by a federal grand jury for various drug offenses. *Id.* at 1283–84. A federal agent went to the defendant's home to interview him. At the outset of the interview, the agent

advised the defendant of his *Miranda* rights and obtained a written waiver. *Id.* at 1284. The defendant later sought to suppress any incriminating statements made during the interview, contending, *inter alia*, that his waiver was invalidated by the agent's post-waiver statement that the defendant's cooperation would " 'help' " him. *Id.* at 1286. The federal district court agreed and suppressed the statements. *Id.* at 1286. The Eighth Circuit reversed, concluding that the agent's "statement that Chadwick's cooperation would 'help' him could not have had any impact on Chadwick's decision to waive his *Miranda* rights, since the waiver had occurred earlier." *Id.* The court was satisfied that the agent's statement "did not in any way influence the waiver." *Id.*

As we assess the facts of this case in light of the authorities discussed above, we recognize that "[c]ustodial interrogations ... have long been a traditional component of police law enforcement...." *Winder,* 362 Md. at 304, 765 A.2d 97. Indeed, such interrogations are an essential tool in "investigating crimes and bringing perpetrators to justice...." *Ball,* 347 Md. at 178, 699 A.2d 1170; *see Moran,* 475 U.S. at 426, 106 S.Ct. 1135. Nevertheless, the "conduct" of an interrogation is not without "boundaries." *Winder,* 362 Md. at 305, 765 A.2d 97. Our review of the authorities cited above convinces us that, under the totality of the circumstances, the court erred in finding a valid waiver of *Miranda.*

We cannot ignore that, before the formal advisement that culminated in appellant's waiver, Detective Canales provided repeated assurances to appellant, asserting many times that the two were "just talking." He also assured Logan that he "won't use any of the information to harm" appellant and that he (Canales) was not "here to hurt" appellant. Then, during the formal advisement of rights, when appellant stated that he "felt kind of comfortable, better with a lawyer," Canales again responded by saying, "we're talking." That response was a clear reference to Canales's earlier assurances to appellant during the background inquiry. Appellant immediately answered by expressing concern that he did not "want to jeop-

ardize anything," and Canales responded: "The only way this jeopardizes you is if you don't tell the truth. . . . If you're telling the truth, we will get through this . . . ." Only then did appellant execute the waiver form.

We underscore that the statements in issue were made immediately *prior* to and *during* the advisement of rights. Indeed, shortly *after* advising appellant under *Miranda* that he had the "right to remain silent," and that anything appellant said could "be used against [him] in court," but *before* appellant signed the waiver, Canales told appellant that "the only way this jeopardizes you is if you don't tell the truth." That representation flatly contradicted the *Miranda* warning, and thus nullified what had been said.

As we see it, Canales's various statements, including his assurances that "we're talking," "[t]he only way this jeopardizes you is if you don't tell the truth," and he "won't use any of the information to harm" appellant, were akin to the flawed assertion in *Hart*, 323 F.3d at 889, that "honesty won't hurt you." They constituted affirmative misstatements that conflicted with the *Miranda* advisement that anything appellant said could be used against him.

We acknowledge that appellant seemed to be aware of his *Miranda* rights even before Canales advised him. Indeed, appellant articulated some of his rights before Canales advised him. For example, appellant stated: "I got a right to Miranda. I got a right to remain silent." Furthermore, appellant had recently been arrested on a drug charge and, at that time, was advised of his *Miranda* rights. But, given the heavy burden on the State, we cannot excuse what happened here merely because appellant had prior experience with the law.

To be sure, we do not suggest that the statements at issue could not have been cured by the police, so as to secure a valid waiver of *Miranda* rights. But, Canales's statement to appellant that "the only way this jeopardizes you is if you don't tell the truth" occurred during the advisement itself, just after Canales told appellant that anything he said could be used

against him, and before appellant actually executed the waiver form. The misstatement was never corrected or clarified by Canales, to impress upon appellant that his statements could, indeed, jeopardize him. In particular, Canales never undertook to make clear to appellant that the two were no longer "just talking"; he did not dispel the notion that no "harm" would come to appellant if he made a statement; and he did not clarify that the truth would "jeopardize" appellant. Therefore, the advisement remained fatally flawed. For this reason, we conclude that the court erred by denying appellant's motion to suppress.

 Nevertheless, we are of the view that the error was harmless beyond a reasonable doubt. *See Dorsey v. State,* 276 Md. 638, 648, 350 A.2d 665 (1976) ("In those circumstances where a violation of a right protected by the Federal Constitution occurs, the Supreme Court, as the ultimate arbiter in interpreting and implementing constitutional guarantees, has declared such error to be 'harmless,' where, upon a review of the evidence offered the '[C]ourt [is] able to declare a belief that it was harmless beyond a reasonable doubt' ") (citation omitted) (alterations in *Dorsey* ); *see also Spain v. State,* 386 Md. 145, 161, 872 A.2d 25 (2005) (citing *Dorsey* in finding harmless error beyond reasonable doubt); *Imes v. State,* 158 Md.App. 176, 182–83, 855 A.2d 381 (" '[W]hen an appellant, in a criminal case, establishes error, unless a reviewing court, upon its own independent review of the ·record, is able to declare a belief, beyond a reasonable doubt, that the error in no way influenced the verdict, such error cannot be deemed "harmless" and a reversal is mandated' ") (citations omitted; alteration in *Imes* ), *cert. denied,* 384 Md. 158, 862 A.2d 994 (2004).

 A court's failure to suppress a statement obtained in violation of *Miranda* can constitute harmless error. *See Hughes v. State,* 346 Md. 80, 92, 695 A.2d 132 (citing cases in which appellate courts have held that failure of trial courts to suppress incriminating statements constituted harmless error), *cert. denied,* 522 U.S. 989, 118 S.Ct. 459, 139 L.Ed.2d 393

(1997); *Bartram v. State,* 33 Md.App. 115, 153, 364 A.2d 1119 (1976) ("It is, of course, settled law that a Miranda error can, indeed, be harmless error"), *affirmed,* 280 Md. 616, 374 A.2d 1144 (1977); *Cummings v. State,* 27 Md.App. 361, 385 n. 5, 341 A.2d 294 ("That a Miranda violation can be harmless error is not to be doubted"), *cert. denied,* 276 Md. 740 (1975).

At trial, appellant conceded criminal agency; he did not deny that he killed the deputies. Instead, appellant's defense centered on his claim that he was not criminally responsible for his actions. Therefore, the admission of appellant's inculpatory statements, in which appellant confessed to the murders, was not prejudicial with respect to the identity of the murderer.

The question remains as to whether the admission of appellant's statements was prejudicial to his NCR defense. The entire interview transcript was admitted at trial. During the interview, appellant denied that he had mental health issues or problems. In its closing argument, the State relied on those denials to support its contention that appellant's conduct was not the result of his mental illness. Specifically, the State argued:

> You see in his statement time and time again he says I made the decision to do this. The tape does not in any way show the person to be schizophrenic. . . .
>
> [H]e clearly says I'm not hearing any voices. There is no auditory hallucinations. He is not hearing any voices, so that's out. The defense experts will say [sic] you see the tape, he was commanded to do this. Yeah, he does say that at one point. He also says I would have gone with them if they would have shown me a warrant.

On the other hand, the defense relied heavily on the statements to support the NCR defense. Appellant's counsel maintained that the statements showed appellant "was floridly psychotic during the interview itself." In closing, he pointed out that appellant gave

> the most bizarre reasons based on delusions and hallucinations, religious preoccupation as to why he did what he did.

\* \* \*

He was forced by a messenger of God to get up and run from downstairs to upstairs, that a gun just appeared. In his own statement he said a gun just appeared while he is moving upstairs. He modifies on questioning as to where he got it, but a gun just appeared in his hand. He was granted the force and power to do what he did. He can't run outside as opposed to going in the bedroom. Why didn't you just leave, go out the back door, or out the front door? He said I can't because my people would be in danger? At that time his family wasn't even there, his wife and children. And ... what he did was not wrong because God had spoken to him, I am the last hope.

Finally he said if I do not act the deputy sheriffs, those people will let what? Let my people, presumably my family, fall in the hands of the pharaohs and back into slavery. Paranoia, delusion, hallucinations at that time, you bet.

There is a 123 page statement, please I beg you to study it. Paranoid schizophrenia during the time of the statement.

Appellant's attorney also maintained that Logan's own assessment of his mental condition, as relied on by the State, was not determinative of his actual mental state. In his closing argument, appellant's counsel argued:

*I Am Not Sick, I Don't Need Help[. A]s I told you in my opening statement ...*, that was the fundamental problem and misunderstanding of James Ramiah Logan before, during and after August 29, 2002. This misperception by him, *the misperception by him as to his own mental health problems*, along with his severe mental disorder, schizophrenia, paranoid, which existed and manifested itself for a long period both before and after the shootings[,] directly caused Mr. Logan to shoot and kill Deputy Sheriffs James Arnaud and Elizabeth Magruder.

\* \* \*

His answers [during the interview] include even then, two days [after the shootings], the first thing [Canales] says

early on in the interview, how are you feeling, James? Any problems? Any mental health problems? *I have no problems* [responds appellant]. *I am not mentally ill [he says] to Canales.* Read it in the statement.

(Emphasis added).

On balance, we conclude that admission of appellant's statements was harmless beyond a reasonable doubt. Therefore, we next consider appellant's challenge to the voir dire.

## III. VOIR DIRE

### A. Facts Pertinent to Voir Dire

Appellant's proposed voir dire included questions about the NCR defense and pretrial publicity.

Regarding pretrial publicity, appellant asked the court to propound the following multi-part question:

4A. Have any of you read, heard, or seen on TV, anything about the case?

B. From where did you obtain your knowledge of the facts?

C. What did you hear?

D. As a result of what you heard about the case, have you formed any opinion as to the guilt or innocence of Mr. Logan or whether he was "not criminally responsible" at the time of the alleged crimes?

E. What is your opinion?

F. In light of your pre-formed opinion do you believe you still could be fair and impartial and render a verdict based solely on the evidence?

After informing the venire panel briefly about the underlying facts, the court propounded the following question: "Do any of you have any knowledge of what I've just described, either personal knowledge, knowledge gained from conversations with other persons, or knowledge gained from the news media?" At the bench, the court heard individually from those prospective jurors who responded affirmatively. When

informed by a prospective juror that he or she had either read or heard about the case from the news media, the court did not attempt to ascertain whether the prospective juror had formed an opinion about the case. Instead, the court asked: "Would the fact that you've heard about this matter prevent you from sitting as a juror and fairly and impartially trying this case?" If the court again received an affirmative response, the court inquired further: "You think you would prejudge this [case]?" In some instances, the court also inquired: "In other words, you would not be able to divorce what you've heard about this?"

On some occasions, the court also asked one of the following questions: "Your knowledge comes from what source?"; "Is that [i.e., your knowledge] from discussions with other persons or from the news media?"; "You recall what news media it was?" The court also told some of the venire: "Tell me what your personal knowledge is," or "What did you read?"

Immediately following the court's inquiry about pretrial publicity, defense counsel objected to the court's failure to ask his proposed Question 4. The following exchange is pertinent:

[COUNSEL FOR APPELLANT]: Your Honor, it seems to me, the question that we submitted on *voir dire* should be— I understand what you've done. You run the show. But it seems to me it should be a 5–part question. Have you heard, seen, read or heard anything about the case and discussed it? What did you hear? As a result of what you've heard or read, have you formed an opinion? What is that opinion and can you set that opinion aside? That's the classic 5–question *voir dire* on pretrial publicity. Your Honor is truncating it.

THE COURT: They all indicated they can put aside whatever it is they heard and fairly and impartially try this case.

[COUNSEL FOR APPELLANT]: I think under *Dingle [v. State,* 361 Md. 1, 759 A.2d 819 (2000) ], that we're entitled to that 5–part question [sic] on death penalties, please, in regards to pretrial publicity.

THE COURT: Okay. Go back and have a seat.

(Emphasis added). The court did not ask any other questions relating to pretrial publicity.

Appellant also asked the court to propound the following five-part question about the NCR defense:

7. Evidence will be produced during trial showing that the Defendant suffered from paranoid schizophrenia at the time of the crime. To that end, the defense will argue that the defendant was not criminally responsible at the time of the crime because, due to his mental disorder, he lacked substantial capacity to appreciate the criminality of his conduct or to conform his conduct to the requirements of the law.

A. If the defendant satisfies his burden in this regard, will any member of the jury be unable to find the defendant not criminally responsible?

B. Does any juror anticipate having difficulty following the Court's instructions on the defense of "not criminally responsible," particularly in view of the crimes charged in the indictment?

C. Has any member of the jury studied psychology or psychiatry?

D. Do you have any reservations or feelings that would prevent you from fairly considering the evidence in the case?

E. In view of the defense of "not criminally responsible," does any member of the venire prefer not to sit on the case?

The following exchange as to Question 7 is pertinent:

[COUNSEL FOR APPELLANT]: [O]ne of our main concerns is our request number 7A through E, because we have a death penalty.

THE COURT: I have a question on there about psychiatric and psychological training.

[COUNSEL FOR APPELLANT]: But nothing in regards to whether or not they would be willing, able to, in fact, allow a defense of insanity.

THE COURT: Well, those have to do with the Court's instructions.

\* \* \*

[COUNSEL FOR APPELLANT]: At the appropriate time after the *voir dire,* we'll just list the questions that we object to. . . .

(Emphasis added).

On voir dire, the court inquired: "Do any of you ladies and gentlemen, or members of your immediate families have any experience, training, or education in the mental health field, such as psychiatry or psychology?" When a prospective juror responded affirmatively, the court asked: "Would that in any way prevent you from sitting as a juror in this case and rendering a fair and impartial verdict?"

The court asked several other general questions during voir dire. These included: "Do any of you have any religious, moral, philosophical or other personal reasons that would make it difficult for you to sit in judgment of another person?"; "Do any of you have any reason that I haven't already gone into why you believe that you could not sit as a juror in this case and render a fair and impartial verdict?"

At the close of voir dire appellant's counsel renewed his objection to the court's refusal to ask his proposed Question 4, concerning pretrial publicity. He asserted:

[W]e object and take exception to the Court's failure to give a number of our voir dire questions, but specifically, for the record, 4A through F which is a 5–part, actually a 6–part question in regards to pretrial publicity.

Now, on those [of the jury panel] that did indicate that they had discussed the matter, you did ask a follow-up question as to whether they had formed an opinion. But it's our belief that the law is in any case where a juror—and I would note, for the record, three panels [of prospective jurors]—at least between 7 to 10 on each of the three panels came to the bench on questions dealing with pretrial publicity.

Your practice was to ask a follow-up question with regards to their opinion if they had discussed it, but you did

not ask a follow-up question on their opinion, whether they can set the opinion aside and what their opinion was in regards to those that had either read, heard newspaper accounts or TV accounts or radio accounts.

We believe that the 6–part format on page 2 of our voir dire, which would be questions 4A through F, is what is legally required in those cases where a juror indicates that he has pretrial publicity.

Appellant's attorney also objected to the court's failure to ask his proposed Question 7. He stated:

[W]e take specific exceptions to ... 7A through E dealing with voir dire questions designed to test whether they [i.e., the prospective jurors] would be fair and impartial and could have a defense of not criminally responsible and evidence of paranoid schizophrenia and questions dealing with the burden of proof, et cetera. I know some of them were given with the actual instructional phase, but the questions we asked went beyond that. That's questions 7A through E. You gave one of them on whether they studied psychology or psychiatry. We think it should have been broader.

## B. Discussion

According to appellant, the court erred by failing to ferret out whether any of the prospective jurors harbored "potential biases towards an insanity defense." Noting that "[t]he single, primary and overriding principle or purpose of voir dire is to ascertain the existence of cause for disqualification," appellant complains that the court compromised his right to a fair and impartial jury. Relying on a host of appellate decisions, including *Sweet v. State*, 371 Md. 1, 806 A.2d 265 (2002), *State v. Thomas*, 369 Md. 202, 798 A.2d 566 (2002), and *Dingle v. State*, 361 Md. 1, 759 A.2d 819 (2000), appellant asserts: "The failure of the trial court to propound voir dire questions relating to Mr. Logan's defense of not criminally responsible rendered the voir dire process constitutionally inadequate to

uncover potential bias" concerning "the defense of insanity . . . ."

Further, Logan argues:

Inasmuch as this case focused so centrally on Mr. Logan's claim that he was not criminally responsible for the killings, it was of paramount importance to determine whether any of the potential jurors harbored biases, preconceived notions, or such strong emotional reactions to a defense of "insanity" that they would be incapable of applying, if found applicable, the defense of not criminally responsible in accordance with the trial court's instructions.

Similarly, Logan complains that the court's "questioning on pretrial publicity was inadequate." Although appellant concedes that the Maryland appellate courts have not "adopted any specific framework for questions regarding pretrial publicity," he maintains that, in light of the recent "change as to . . . the depth of questioning of voir dire," the "trial court's voir dire on the issue of pretrial publicity . . . was woefully inadequate." In appellant's view, the court's voir dire relating to pretrial publicity "amounted to little more than bottom line questioning." Logan adds: "[N]othing in the court's inquiry or the jurors' responses thereto shed any light whatsoever on the *nature* or *effect* of the exposure. All that was obtained by means of the court's inquiry was that several jurors had "knowledge" about the case and from what source. . . ." According to Logan, by failing to make "critical inquiries" about the content of the publicity to which a veniremember was exposed, and whether the potential juror had "formed an opinion about the case," the court "missed the mark" and "deprived Appellant of critical information that might lead to disqualification for cause." Moreover, he complains that the jurors were improperly required to assess for themselves whether they could serve fairly and impartially.

Appellant contends that the " 'court should ask jurors what information they have received, ask responding jurors about the prejudicial effect of such information, and then independently determine whether such information has tainted jurors'

impartiality.' " (Quoting *United States v. Beckner,* 69 F.3d 1290, 1291–92 (5th Cir.1995)). Noting that " '[j]urors are in a poor position to make determinations as to their own impartiality' " (quoting *Beckner,* 69 F.3d at 1293), appellant insists that the trial court's failure to conduct a more searching inquiry constituted reversible error.

The State counters: "Decisions about the extent of the voir dire procedure, as well as the specific questions to be asked on voir dire, generally fall within the sound discretion of the trial court." As to the court's rejection of appellant's proposed Question 7, relating to the NCR defense, the State argues:

The refusal to ask this set of questions was not an abuse of discretion. Both this Court and the Court of Appeals have recognized that a trial court need not inquire on voir dire as to whether the jury can or will follow the court's instructions[.] ... Here, not only did [sub] questions one, two and five call for entirely speculative responses, they also were directed at matters inappropriate for voir dire. To adopt Logan's reasoning, any and all legal principles that might apply during the trial would need to be spelled out during voir dire for the purposes of eliciting the jurors' attitudes and responses thereto. Obviously, such an approach is untenable and not one contemplated by the voir dire process.

Moreover, the State maintains that appellant's requested questions regarding his NCR defense were "covered by [other] voir dire questions posed by the court." It points out:

The court specifically asked the venire whether anyone among them had "any experience, training, or education in the mental health field; specifically, psychiatry or psychology?" The court further asked: ["Do any of you have any religious, moral, philosophical or other personal reasons that would make it difficult for you to sit in judgment of another person?"; "Do any of you have any reason that I haven't already gone into why you believe that you could not sit as a juror in this case and render a fair and impartial verdict?"] The venire knew that Logan was charged with killing

Arnaud and Magruder and that he pled "not guilty and not criminally responsible." The scope of these questions were adequate to reveal any potential juror bias related to Logan's case.[1]

(Citations omitted).

As to appellant's contentions concerning pretrial publicity, the State maintains that the court's voir dire "was sufficient to adduce any potential juror bias emanating from a juror's exposure to pretrial publicity...." It insists that "any prospective juror who harbored pre-conceived notions or biases based on the exposure to pretrial publicity would have been detected by means of the voir dire questions actually posed."

According to the State, the court also utilized the proper methodology during voir dire, because it "inquired whether any juror had acquired knowledge of the case," then "questioned [the venire] on the source of the information as to whether it would affect his or her ability to be impartial," and, finally, it "independently determined whether each responding juror could judge Logan impartially." As to both pretrial publicity and NCR, the State urges this Court not to expand the role of voir dire, stating: "There is simply no need or justification to expand the purpose or process of voir dire." It reminds us that it "is for the Court of Appeals, not this Court," to decide that "a well-established principle of law has become 'outmoded'...."

■■ It is well settled that the "overriding principle or purpose" of voir dire is to ascertain " ' "the existence of cause for disqualification." ' " *Hill v. State*, 339 Md. 275, 279, 661 A.2d 1164 (1995) (citations omitted); *see Thomas, supra,* 369 Md. at 206, 798 A.2d 566; *Dingle, supra,* 361 Md. at 9, 759 A.2d 819; *Boyd v. State,* 341 Md. 431, 435, 671 A.2d 33 (1996). As this Court said in *Wilson v. State,* the "purpose of the *voir dire* process is to determine the prospective jurors' state of mind, and further, to ascertain whether the venire harbors any bias, prejudice, or preconception regarding the accused, a central matter in the case such as the crime, or any relevant collateral matter." 148 Md.App. 601, 658, 814 A.2d 1 (2002),

*cert. denied,* 374 Md. 84, 821 A.2d 371 (2003). *See Fowlkes v. State,* 117 Md.App. 573, 583–84, 701 A.2d 862 (1997) (same), *cert. denied,* 348 Md. 523, 704 A.2d 1244 (1998).

In general, "[t]he scope of *voir* dire and the form of the questions propounded rest firmly within the discretion of the trial judge." *Baker v. State,* 157 Md.App. 600, 610, 853 A.2d 796 (2004); *see Hill,* 339 Md. at 279, 661 A.2d 1164; *Perry v. State,* 344 Md. 204, 218, 686 A.2d 274 (1996), *cert. denied,* 520 U.S. 1146, 117 S.Ct. 1318, 137 L.Ed.2d 480 (1997). The Court of Appeals has recognized that questions that are " 'speculative, inquisitorial, catechising, or "fishing," asked in the aid of deciding on peremptory challenges, may be refused in the discretion of the court, even though it would not have been error to have asked them.' " *Davis v. State,* 333 Md. 27, 34, 633 A.2d 867 (1993) (citation omitted).

Notwithstanding the broad discretion afforded to the trial court in voir dire, there are "areas of inquiry that are mandatory," *Uzzle, supra,* 152 Md.App. at 562, 832 A.2d 869, because they "involve 'potential biases or predispositions that prospective jurors may hold which, if present, would hinder their ability to objectively resolve the matter before them.' " *Dingle,* 361 Md. at 10 n. 8, 759 A.2d 819 (citation omitted). The areas include "racial, ethnic and cultural bias"; "religious bias"; "predisposition as to the use of circumstantial evidence in capital cases"; and "placement of undue weight on police officer credibility." *Id.* Questions beyond these required subjects must go "directly to the question of juror bias and unequivocal disqualification." *Uzzle,* 152 Md.App. at 562, 832 A.2d 869.

When deciding whether to propound a question beyond one of the mandatory areas of inquiry, "the trial judge must assess whether there is a reasonable likelihood that a given line of inquiry will reveal a basis for disqualification." *Id.* at 560, 832 A.2d 869. "Absent such a reasonable likelihood, there is no necessity to pursue the inquiry, notwithstanding the possibility that some conceivable basis for disqualification might be revealed." *Id.* To determine "rea-

sonable likelihood," the trial court should consider "whether a proposed inquiry is *reasonably* likely to reveal disqualifying partiality or bias," and should weigh "the expenditure of time and resources in the pursuit of the reason for the response to a proposed *voir dire* question against the likelihood that pursuing the reason for the response will reveal bias or partiality." *Perry,* 344 Md. at 220, 686 A.2d 274 (emphasis in original); *see Uzzle,* 152 Md.App. at 561, 832 A.2d 869.

### 1. The NCR Defense

As noted, appellant maintains that his proposed questions relating to his NCR defense were integral to a determination of potential juror bias. The court only propounded a variation of appellant's proposed Question 7C; it merely inquired whether any of the prospective jurors or members of their immediate families had "any experience, training, or education in the mental health field, such as psychiatry or psychology?" While we do not endorse appellant's proposed phraseology in Question 7, it is noteworthy that the court did not refuse to propound Question 7 because of the form or phraseology. Nor did the court ask appellant's attorney to reformulate his questions.

We pause to note that the form of the voir dire questions is "clearly within the sound discretion of the court." *Casey v. Roman Catholic Archbishop of Baltimore,* 217 Md. 595, 606, 143 A.2d 627 (1958). Even if appellant's questions were not well framed, however, it is clear that he sought to discover cause for disqualification based on bias towards an insanity defense. On that basis, if the court below was not satisfied with the form, it could have reformulated the questions or allowed defense counsel to do so. *See Contee v. State,* 223 Md. 575, 580, 165 A.2d 889 (1960) (concluding that the defendant "was denied an opportunity . . . to frame additional proper *voir dire* questions . . . and the court failed to ask, on its own motion, as it should have done, a proper question designed to ascertain the existence of cause for disqualification . . . .").

On the merits, we agree with Logan that the subject matter of the NCR defense was of considerable importance, and it should have been carefully explored on voir dire. We explain.

*Thomas, supra,* 369 Md. 202, 798 A.2d 566, is instructive. In that case, the respondent was charged with possession and distribution of cocaine. On voir dire, the court refused to propound the following question proposed by the defendant: " 'Does any member of the jury panel have such strong feelings regarding violations of the narcotics laws that it would be difficult for you to fairly and impartially weigh the facts at a trial where narcotics violations have been alleged?' " *Id.* at 204, 798 A.2d 566. This Court determined that the trial court abused its discretion and remanded for a new trial. *Id.* at 206, 798 A.2d 566. The Court of Appeals agreed. *Id.* at 204, 798 A.2d 566.

Of import here, the Court concluded, *id.* at 212, 798 A.2d 566: "[V]oir dire questions on drug attitudes 'are effective in revealing strong feelings towards narcotics laws that may hinder a juror's ability to serve.' " (Citation omitted). It reasoned, *id.* at 207, 213–14, 798 A.2d 566:

> *"[T]he questions [on voir dire] should focus on issues particular to the defendant's case so that biases directly related to the crime, the witnesses, or the defendant may be uncovered. . . . "*

\* \* \*

As we have seen, and so often reiterated, the single, primary, and overriding principle or purpose of voir dire is to ascertain " 'the existence of cause for disqualification[,]' " . . . and this is accomplished through the pursuit of one of the two mandatory areas of inquiry, *i.e.,* "an examination of a jury . . . conducted strictly within the right to discover the state of mind of the juror in respect to the matter in hand or any collateral matter reasonably liable to unduly influence him.' " . . . We have been emphatic, even in civil cases, that "a party is entitled to a jury free of all disqualifying bias or prejudice without exception, and not merely a

jury free of bias or prejudice of a general or abstract nature." ... And, although we have entrusted the trial court with considerable discretion, we have admonished:

> " 'In the exercise of that discretion, the trial judge should adapt the questions to the needs of each case in the effort to secure an impartial jury. Any circumstances that may reasonably be regarded as rendering a person unfitted for jury service may be made the subject of questions and a challenge for cause. Accordingly an examination of a juror on his voir dire is proper as long as it is conducted within the right to discover the juror's state of mind in respect to the matter in hand or any collateral matter reasonably liable to unduly influence him.' "

> *A question aimed at uncovering a venire person's bias because of the nature of the crime with which the defendant is charged is directly relevant to, and focuses on, an issue particular to the defendant's case and, so should be uncovered....* We agree with the intermediate appellate court: the proposed voir dire question should have been asked. The trial court abused its discretion when it refused to do so.

(Citations omitted) (emphasis added).

*Sweet v. State, supra,* 371 Md. 1, 806 A.2d 265, also provides guidance. There, the petitioner was convicted of second degree assault and third degree sexual offense of a minor. *Id.* at 3, 4, 806 A.2d 265. The Court of Appeals granted certiorari to consider, *inter alia,* whether the trial court erred in refusing to pose the following voir dire question requested by the defendant: "Do the charges stir up strong emotional feelings in you that would affect your ability to be fair and impartial in this case?" *Id.* at 3, 9, 806 A.2d 265. The Court concluded "that the trial court abused its discretion in failing to pose [the] requested *voir dire* question." *Id.* at 10, 806 A.2d 265. Adopting its reasoning in *Thomas,* 369 Md. 202, 798 A.2d 566, the Court agreed that the petitioner's proposed question "was directed at biases, specifically those related to [the] alleged criminal act, that, if uncovered, would be disqualifying when

they impaired the ability of the juror to be fair and impartial."
*Sweet*, 371 Md. at 10, 806 A.2d 265.

The State points to our recent decision in *Baker, supra,* 157
Md.App. 600, 853 A.2d 796, for the proposition that a reversal
here would amount to a decision that the reasoning of the
Court of Appeals in *Twining v. State,* 234 Md. 97, 198 A.2d
291 (1964), is "now outmoded." *Baker,* 157 Md.App. at 618,
853 A.2d 796. As we see it, the State's reliance on *Twining* is
misplaced.

In *Twining,* 234 Md. at 100, 198 A.2d 291, the Court of
Appeals found no abuse of discretion by the trial court in
refusing to ask whether the venire "would give the accused
the benefit of the presumption of innocence and the burden of
proof." Notably, the Court said: "The rules of law stated in
the proposed questions were fully and fairly covered in the
subsequent instructions to the jury." *Id.* at 100, 198 A.2d 291.
The Court added: "It is generally recognized that it is inap-
propriate to instruct on the law at [the voir dire] stage of the
case, or to question the jury as to whether or not they would
be disposed to follow or apply stated rules of law." *Id.*

In *Baker,* 157 Md.App. 600, 853 A.2d 796, the appellant was
charged with assault and use of a handgun in the commission
of a crime of violence. *Id.* at 604, 853 A.2d 796. At trial, the
appellant did not deny that he shot the victim, but claimed
that he acted in self-defense and to defend his girlfriend. *Id.*
After the jury convicted the appellant of all charges, he noted
an appeal. *Id.* He argued, *inter alia,* that the trial court
erred by rejecting the following voir dire question: "[D]o you
have any bias or prejudice concerning handguns which would
prevent you from fairly weighing the evidence in this case[?]"
*Id.* at 608, 853 A.2d 796. We agreed with the appellant that
the court erred.

Looking to the Court of Appeals's decisions in *Thomas,* 369
Md. 202, 798 A.2d 566, and *Sweet,* 371 Md. 1, 806 A.2d 265,
this Court reasoned:

> Here, *appellant shot an unarmed man with a handgun,
> allegedly in self-defense* or defense of his girlfriend. One of

the facts the jury might have to decide was whether appellant used reasonable force. *The trial court should have asked whether any prospective juror had strong feelings about handguns that would have affected his or her ability to weigh the issues fairly.*

157 Md.App. at 613, 853 A.2d 796 (emphasis added).

On the other hand, we rejected the appellant's claim in *Baker* that the trial court erred by failing to ask the venire if they would draw an inference of guilt if the defendant elected not to testify. *Id.* at 615–16, 853 A.2d 796. We concluded that the court "was not required to ask jurors whether they would draw an inference from the defendant's election not to testify." *Id.* at 616, 853 A.2d 796. In reaching that conclusion, the *Baker* Court looked to *Twining, supra,* 234 Md. 97, 198 A.2d 291, in which the Court of Appeals determined that the trial court need not ask the venire whether they would follow the court's instructions as to the law. *Baker,* 157 Md.App. at 616, 853 A.2d 796. Adhering to *Twining,* the *Baker* Court declined to require voir dire questions aimed at determining whether the venire would abide by the court's instructions on the rules of law. *Id.* at 616, 853 A.2d 796. Although we recognized that other jurisdictions "have reached a different conclusion," *id.* at 617, 853 A.2d 796, we said: "[I]t is up to the Court of Appeals, not this Court, to decide ... that the reasoning of *Twining* is 'now outmoded.' " *Id.* at 618, 853 A.2d 796 (citation omitted in *Baker*).

■ The above discussion leads us to conclude that appellant was not entitled to voir dire Questions 7A and 7B. Under *Twining,* Questions 7A and 7B were not proper voir dire inquiries, because they pertained to whether prospective jurors would apply the rules of law as instructed by the court. But, Question 7 was not limited in scope to whether the prospective jurors would follow the court's instructions on the law. To the contrary, the central theme of Question 7 was aimed at ascertaining whether the venire harbored a bias towards an NCR defense.

 We are mindful that the questions requested *in Thomas* and *Sweet* related to the crimes with which the defendant was charged, while here, as in *Baker,* Question 7 pertained to appellant's *defense.* Having conceded that he shot the sheriffs, Logan's entire defense hinged on his claim that he lacked criminal responsibility because of his deranged mental state. Therefore, questions regarding the venire's views toward the NCR defense were crucial to the determination of whether there was cause for disqualification.

In connection with appellant's NCR defense, the jury had to determine whether he suffered from a mental illness that negated his criminal responsibility. Some members of the venire might have been disdainful of an NCR defense, particularly in the context of the shooting deaths of two law enforcement officers who were killed in the line of duty. Precisely because the subject matter of an NCR defense is a controversial one, the trial court should have inquired whether any prospective jurors had reservations or strong feelings regarding such a defense. What we said in *Gregory v. State,* 40 Md.App. 297, 326, 391 A.2d 437 (1978), in the context of cross-examination, seems equally applicable to voir dire:

> Psychiatry—particularly the forensic branch of it—is an inexact science. *See New York Life Ins. Co. v. Taylor,* 147 F.2d 297, 304 (D.C.Cir.1945), opinion on rehearing. One need do no more than peruse the reported appellate opinions touching upon the issue of a criminal defendant's "sanity" to see the frequency with which well-qualified and presumably competent practitioners express different—and sometimes widely varying—opinions concerning that critical issue. Considering the less-than-certain and ever shifting state of the art, these opinions, given their ultimate potential effect, cry out for cross-examination.

Although we have not found an appellate case in Maryland discussing voir dire with respect to an NCR defense, cases outside Maryland help to elucidate our concern. We pause to consider them.

In *People v. Mapp*, 283 Ill.App.3d 979, 219 Ill.Dec. 174, 670 N.E.2d 852 (1996), *appeal denied*, 171 Ill.2d 576, 222 Ill.Dec. 435, 677 N.E.2d 969 (1997), the appellant was convicted of armed robbery and felony murder. *Id.* 219 Ill.Dec. 174, 670 N.E.2d at 855. At trial, over the defendant's objection, several potential jurors were asked about their views of criminal responsibility in the context of felony murder principles, because the defendant was not the alleged shooter. *Id.* 219 Ill.Dec. 174, 670 N.E.2d at 855. The Illinois appellate court determined that the court erred in allowing the questions, but concluded that the error was harmless. *Id.* 219 Ill.Dec. 174, 670 N.E.2d at 860. In reaching its conclusion as to the voir dire, the *Mapp* court noted that, "[o]rdinarily, . . . questions concerning a specific defense will be excluded." *Id.* 219 Ill.Dec. 174, 670 N.E.2d at 857. Nevertheless, in dicta, the court recognized that a defendant has the "right to have jurors questioned about their willingness to follow the law on the insanity defense." *Id.* 219 Ill.Dec. 174, 670 N.E.2d at 858. The court explained, *id:*

> Why questions about the insanity defense but not compulsion or self-defense? The [Illinois] Supreme Court supplied the answer: " * * * *the jury was going to be asked to apply an extraordinarily controversial legal requirement against which many members of the community may have been prejudiced.*" . . . That is, *the insanity defense is a "subject of intense controversy,"* and simply asking jurors whether they could faithfully apply the law as instructed was not enough to reveal juror bias and prejudice toward that defense.

(Citations omitted) (emphasis added).

*People v. Stack*, 112 Ill.2d 301, 97 Ill.Dec. 676, 493 N.E.2d 339, *cert. denied*, 479 U.S. 870, 107 S.Ct. 236, 93 L.Ed.2d 162 (1986), is also illuminating. There, the defendant was convicted of the murders of his wife and infant son. At trial, he admitted to the killings, but claimed he was insane at the time. *Id.* 97 Ill.Dec. 676, 493 N.E.2d at 340. The jury rejected the defense. *Id.* The Illinois appellate court reversed the conviction on several grounds, including that the trial judge erred in

refusing to ask the potential jurors various questions relating to the insanity defense. *Id.* 97 Ill.Dec. 676, 493 N.E.2d at 343. Specifically, the defendant proposed the following questions, *id.:*

1. Have you or anyone close to you had any experience with a psychiatrist or psychologist?
2. Do you agree with the concept that a person should not be held responsible for his acts if he is not capable of conforming his conduct to the requirements of the law?
3. Can you find someone not guilty by reason of insanity?
4. Do you have any feeling or viewpoint concerning the defense of insanity in a criminal case? If so, what?

Of the four questions, the trial court only asked the first. *Id.* The Illinois Supreme Court agreed that the trial court properly rejected the second and third questions because they were "vague and improperly phrased." *Id.* But, the court held that the fourth question, which inquired into whether the venirepersons had any feelings or viewpoints concerning an insanity defense, was proper and should have been asked, because it "does not attempt to state the law but merely probes for bias...." *Id.* 97 Ill.Dec. 676, 493 N.E.2d at 344.

The *Stack* court looked to other Illinois cases that held that questions concerning the prospective jurors' attitudes and viewpoints on other subjects, such as the death penalty, were proper on voir dire. *Id.* The court stated, *id.:*

> The thread which runs through those cases is that *the jury was going to be asked to apply an extraordinarily controversial legal requirement against which many members of the community may have been prejudiced.*

\* \* \*

> *Although the insanity defense upon which the defendant relied is a well-recognized legal defense, it remains a subject of intense controversy.* In *People v. Bowel* (1986), 111 Ill.2d 58, 65, 94 Ill.Dec. 748, 488 N.E.2d 995, we described insanity as "a defense which is known to be subject to bias or prejudice." A defendant's right to an

impartial jury is not, therefore, protected where the sole inquiry into whether jurors will abide by the law allowing that controversial defense is the far broader and all-embracing question ... namely, whether the jurors would follow the court's instructions on the law.

(Emphasis added).

*State v. Frederiksen,* 40 Wash.App. 749, 700 P.2d 369, *review denied,* 104 Wash.2d 1013 (1985), is also informative. There, the appellant was convicted of second degree assault while armed with a deadly weapon and a firearm. *Id.* at 371. On appeal, he contended, *inter alia,* that the trial court erred in rejecting his proposed voir dire questions regarding the prospective jurors' attitudes toward self-defense. *Id.* at 370. The appellate court disagreed and affirmed the conviction. *Id.* at 374.

The *Frederiksen* Court concluded that "self-defense in general did not fall within any of the three classes raising a real possibility of bias." *Id.* at 372. But, it recognized three situations requiring "specific voir dire questions because of a real possibility of prejudice." *Id.* These are:

(1) when the case carries racial overtones; (2) *when the case involves other matters (e.g., the insanity defense) concerning which either the local community or the population at large is commonly known to harbor strong feelings that may stop short of presumptive bias in law yet significantly skew deliberations in fact;* and (3) when the case involves other forms of bias and distorting influence which have become evident through experience with juries (*e.g.,* the tendency to overvalue official government agents' testimony.)

*Id.* (emphasis added).

We conclude that the court below erred or abused its discretion in failing to propound questions concerning juror attitudes and potential bias about an NCR defense. Such questions are "directly relevant to, and focus[ ] on, an issue particular to the defendant's case and, so, should be uncovered." *Thomas,* 369 Md. at 214, 798 A.2d 566.

■ We next address appellant's objections to the court's inquiry concerning pretrial publicity. Appellant relies on *Dingle* to support his claim of error as to the form of the court's questions.

In *Dingle, supra*, 361 Md. 1, 759 A.2d 819, the petitioner was indicted for robbery with a dangerous and deadly weapon and related charges and sought various voir dire questions concerning whether any of the venirepersons had certain experiences or associations. *Id.* at 3, 759 A.2d 819. Although the court asked the petitioner's questions, it joined, as part of a compound question, "an inquiry into whether the experience or association posited would affect the prospective jury's ability to be fair and impartial." *Id.* at 3–4, 759 A.2d 819. The court instructed the prospective jurors that, if their answers to both parts of the question were in the negative, then they did not need to approach the bench and reveal their answers. *Id.* at 4, 759 A.2d 819.

The Court of Appeals concluded, *id.* at 8–9, 759 A.2d 819, that the petitioner was entitled to a new trial because "the voir dire procedure ... usurped the court's responsibility" of impaneling the jury and determining, "in the final analysis, the fitness of the individual venire persons." *Id.* at 8, 759 A.2d 819. Writing for the Court, Chief Judge Bell reasoned:

> [V]oir dire, whether in a capital case or in the more usual situation, to be meaningful, must uncover more than "the jurors['] bottom line conclusions [to broad questions], which do not in themselves reveal automatically disqualifying biases as to their ability fairly and accurately to decide the case, and, indeed, which do not elucidate the bases for those conclusions...."

\* \* \*

Confession by a venire person is one way of establishing bias, but it is not the only way; "the strike for cause process encompasses the situation where the motion to strike is made on the basis of information developed during the voir dire process, not simply where the prospective juror admits

an inability to be fair and impartial." *Davis,* 333 Md. at 63, 633 A.2d at 885 (Bell, J. dissenting).

\* \* \*

[I]n those cases where the venire person has had the questioned experience or association, but believes he or she can be fair, the procedure followed in this case shifts from the trial judge to the venire responsibility to decide juror bias. Without information bearing on the relevant experiences or association of the affected individual venire persons who were not required to respond, the court simply does not have the ability, and therefore, is unable to evaluate whether such persons are capable of conducting themselves impartially. Moreover, the petitioner is deprived of the ability to challenge any of those persons for cause. Rather than advancing the purpose of voir dire, the form of the challenged inquiries in this case distorts and frustrates it.

*Id.* at 15, 21, 759 A.2d 819 (Citation omitted) (alteration in *Dingle* ).

Moreover, the Court reiterated that the trial court has the responsibility to decide, based upon the circumstances then existing, *i.e.* "in addition to the venire person's bottom line conclusion in that regard, as reflected in the answers he or she gives, the character and duration of the position, the venire person's demeanor, and any and all other relevant circumstances," or, in other words, whether any of the venire persons occupying the questioned status or having the questioned experiences should be discharged for cause, or whether "a demonstrably strong correlation [exists] between the status [or experience] in question and a mental state that gives rise to cause for disqualification."

361 Md. at 17, 759 A.2d 819 (citation omitted) (alterations in original).

We agree with the State that *Dingle* is factually distinguishable from this case. Here, the court did not ask two-part compound questions that required the potential juror to approach only if he or she answered yes to both parts of the

question. Rather, the court first identified the venire-
members who heard about the case and then individually
questioned each potential juror to determine the source of the
information and whether the information would affect his or
her ability to act fairly and impartially.

Nevertheless, we agree with appellant that the court should
have asked some variation of his proposed Question 4D, which
inquired directly of the jurors who had been exposed to
pretrial publicity whether they had formed an opinion about
the case based on such exposure. Instead, the court inquired
whether the jurors believed they could serve fairly and impar-
tially. The court's question sought to uncover the jurors' own
"bottom line conclusions" as to their impartiality. *Dingle*, 361
Md. at 15, 759 A.2d 819. Put another way, in instances when
the prospective juror responded that he or she could be
impartial, despite the exposure to pretrial publicity, the court's
inquiry ended. In effect, the court shifted to the venire its
"responsibility to decide juror bias." *Dingle*, 361 Md. at 21,
759 A.2d 819. In light of the gravity of this case, we do not
have a "reasonable assurance that prejudice would be discov-
ered if present." *White v. State, supra*, 374 Md. at 242, 821
A.2d 459.

 We disagree with appellant, however, that the court
was obligated to ask proposed Question 4C, which inquired
into the nature or content of the pretrial publicity to which the
juror had been exposed. In *Mu'Min v. Virginia*, 500 U.S.
415, 111 S.Ct. 1899, 114 L.Ed.2d 493, *rehearing den.*, 501 U.S.
1269, 112 S.Ct. 13, 115 L.Ed.2d 1097 (1991), the United States
Supreme Court, in a 5–4 decision, rejected the notion that
questions regarding the content of pretrial publicity were
constitutionally required. *Id.* at 422, 111 S.Ct. 1899. Chief
Justice Rehnquist, writing on behalf of the majority, stated:

Whether a trial court decides to put questions about the
content of publicity to a potential juror or not, it must make
the same decision at the end of the questioning: is this juror
to be believed when he says he has not formed an opinion
about the case? *Questions about the content of the publici-*

*ty to which jurors have been exposed might be helpful* in assessing whether a juror is impartial. *To be constitutionally compelled, however, it is not enough that such questions might be helpful.* Rather, the trial court's failure to ask these questions must render the defendant's trial fundamentally unfair.

*Id.* at 425–26, 111 S.Ct. 1899 (emphasis added).

## IV. REMAINING ISSUES

### A. Right to Confrontation

#### 1.

As noted, appellant presented three expert witnesses to establish his NCR defense. One of those experts, Joanna Brandt, M.D., was accepted at trial, as a defense expert in general and forensic psychiatry. She testified that appellant suffered from "schizophrenia, paranoid type" and "cocaine dependence and cannabis dependence." Further, she opined that appellant was not criminally responsible for his actions at the time of the shootings.

On direct examination, Dr. Brandt explained that, in reaching her diagnosis, she reviewed the diagnosis of Dr. Mattie White, the detention center psychiatrist who evaluated appellant while he was incarcerated. Dr. White's diagnosis was contained in the detention center medical records, which were accepted into evidence at trial as a defense exhibit. According to Dr. Brandt, Dr. White diagnosed appellant as having a "drug induced psychotic disorder, rule out bipolar disorder...." Dr. White did not testify, however.

On cross-examination, and over objection from appellant's counsel, the State questioned Dr. Brandt as to whether Dr. White diagnosed appellant "as paranoid schizophrenic." Appellant argued that such testimony violated his Sixth Amendment right to confrontation. The State countered that appellant waived his objection by eliciting Dr. White's opinion through Dr. Brandt's testimony on direct examination. The court denied appellant's objection, noting that, in answering

the State's question, Dr. Brandt would not be going beyond the contents of Dr. White's records, which had been previously accepted into evidence.

Appellant renews his claim of error based on confrontation grounds. According to appellant: "Under both *Gregory* [*v. State, supra,* 40 Md.App. 297, 391 A.2d 437], and *Crawford* [*v. Washington,* 541 U.S. 36, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004) ], Mr. Logan's right of confrontation was violated because there was no showing that [the] declarant was unavailable, and could not have been presented at trial by the State and subjected to cross-examination by defense counsel." The State counters: "Having affirmatively introduced the Detention Center's medical records, including Dr. White's diagnosis, into evidence, and having also elicited testimony from Dr. Brandt regarding conclusions contained in those records, [appellant] should not now be heard to complain about the State's limited inquiry into the same subject on cross-examination." Moreover, the State argues that, even if Dr. Brandt's testimony relating to the contents of the detention center medical records constituted hearsay, it was admissible under Md. Rule 5–803(b)(7), "which excepts from the hearsay rule the absence of an entry in records of regularly conducted business activity where such an absence is of a kind about which such records were regularly made and preserved."

We decline to address this issue, because it may not arise on remand. First, we do not know whether appellant will introduce the medical records that generated the issue. Second, the parties may opt to call Dr. White, which would obviate the concern.

Moreover, the court below did not have the benefit of *Crawford,* which was decided in March of 2004, four months after the trial. Since then, this Court has decided *Rollins v. State,* 161 Md.App. 34, 866 A.2d 926, *cert. granted,* 387 Md. 462, 875 A.2d 767 (2005), and *Snowden v. State,* 156 Md.App. 139, 846 A.2d 36 (2004), *aff'd,* 385 Md. 64, 867 A.2d 314 (2005), which are also relevant. On remand, in the event that the issue again arises, the court and the parties will have the

opportunity to consider the issue in light of the cases mentioned above.

## B. Jury Instructions

Appellant raises numerous objections to the court's instructions to the jury. Specifically, he argues that the court erred in failing to give (1) an instruction about "settled or fixed insanity"; (2) a modified version of the pattern jury instruction on NCR, stating that to "appreciate" the criminality of one's conduct means more than to "know" that one's conduct is criminal; and (3) an instruction regarding the distinction between intent and criminal responsibility.

Because we have vacated appellant's conviction, we decline to address appellant's objections to the court's instructions. *See Darby v. State,* 45 Md.App. 585, 595, 414 A.2d 248 (1980) (where Court reversed convictions after it held that the circuit court erred in failing to suppress the appellant's confession, it stated: "As reversal of appellant's conviction is mandated by this determination, we shall decline to address further the alleged error in the court's instructions"); *see also Jones v. State,* 280 Md. 282, 288, 372 A.2d 1064 (1977) ("In light of our decision that there must be a new trial, we need not decide whether the court applied the correct burden of proof on finding appellant competent ..."); *Hadid v. Alexander,* 55 Md.App. 344, 354, 462 A.2d 1216 (declining to reach another of appellant's issues where Court determined "previously that reversible error has been committed"), *cert. denied,* 297 Md. 310 (1983).

**JUDGMENT VACATED.**

**CASE REMANDED TO THE CIRCUIT COURT FOR PRINCE GEORGE'S COUNTY FOR NEW TRIAL.**

**COSTS TO BE PAID BY PRINCE GEORGE'S COUNTY.**